EDWARD R. HANDLAN, Plaintiff, v. A. H. HANDLAN, A. H. HANDLAN, JR., HANDLAN-BUCK COMPANY, a Corporation, and HANDLAN, INC., a Corporation, Defendants, No. 41287—232 S. W. (2d) 944.

Division One, September 11, 1950.

Motions for Modification of Opinion and Mandate, for Rehearing or to Transfer to Banc Overruled, October 9, 1950.

1152

*Flynn & Parker, Francis C. Flynn* and *Norman C. Parker* for appellants.

*John J. Nangle* and *Roberts P. Elam* for respondent John J. Nangle.

Harry S. *Gleick* for respondent; *Gleick & Strauss* of counsel.

1156

██ HYDE, J.—This is an action in equity for liquidation of two affiliated corporations, also seeking an accounting from the individual defendants, injunctions against them as to future operations and appointment of a receiver. The Court appointed a temporary receiver on February 19, 1947 and made this appointment permanent by final decree entered August 16, 1948. Defendants, A. H. Handlan and A. H. Handlan, Jr., have appealed from this decree and also from allowances of attorneys' fees and from orders refusing to revoke the receivership appointments, and these appeals have been consolidated. The motions to dismiss these appeals are overruled. Plaintiff has also appealed from a finding in favor of A. H. Handlan on some of the items for which plaintiff claims he should be ordered to account. The record shows the value of control of these corporations, and also the amount of fees allowed, to be in excess of our jurisdictional amount. (See Stipp v. Bailey, 331 Mo. 374, 53 S. W. (2d) 872.) Defendant A. H. Handlan, President of these corporations, is being deprived of an annual salary of $12,500.00. Hereafter we refer to A. H. Handlan as the defendant. The real controversy is between him and his brother, the plaintiff.

This case is unique in involving receivership of two solvent, liquid corporations successfully operating a prosperous business. It was brought about because these two brothers were unable to agree upon their policies and operations. The principal question is whether there is a deadlock in the management and operation of these corporations which threaten irreparable injury so that their business will have to be sold or liquidated.

Each corporation has 1000 shares of no par value stock. Plaintiff and defendant each own 500 shares of the stock of Handlan-Buck, although one of defendant's shares stands in the name of his son A. H. Handlan, Jr. to qualify him as a director. Plaintiff and defendant each have 400 shares of Handlan, Inc. Defendant's wife, Ella M. Handlan, owns 200 shares but three of these stand in the name of A. H. Handlan, and there is one each in the names of two employees. Defendant was 72 at the time of the receivership and plaintiff was a few years younger, but old enough ██ to be a veteran of the Spanish-American War. A. H. Handlan, Jr. was 45 and plaintiff's son, E. K. Handlan, was 26. In 1946, E. K. Handlan returned from service in World War II and was employed in the business.

██ Defendant's first contention is that the decree should be reversed and remanded because the application for change of venue of A. H. Handlan was not granted. This application, on the ground of prejudice of Judge Sartorius, was filed on March 28, 1947, after the filing of defendant's answer, after the appointment of the temporary receiver, and after the case had been transferred by agreement from Division 3 to Division 18, when Judge Sartorius was reassigned. It was overruled on the ground that it was not timely filed and was

not made in good faith. Defendant's original attorney withdrew after the temporary receiver was appointed and he and his son were represented by their present attorneys when the application for change of venue was made. Defendant further contends that Judge Sartorius was in fact biased and should have voluntarily disqualified himself. This is based on the fact that he held several pre-trial conferences before the temporary receiver was appointed for the purpose of working out a plan of settlement by increasing the number of directors of the corporations and otherwise changing their by-laws, after which the parties failed to reach an agreement. However, we consider this whole matter of disqualification of Judge Sartorius abandoned when, after the trial on the merits, no mention of it was made in defendant's motion for new trial. (Sec. 847.140a Mo. R. S. A.; Rule 3.23; Wolff v. Ward, 104 Mo. 127, 16 S. W. 161 and cases cited.)

Defendant says we should consider this under Rule 3.27; but Rule 3.27 was not intended to be a substitute for all other rules. It is to be applied only when manifest injustice or miscarriage of justice cannot be prevented in any other way. We have applied it when the plaintiff did not have a case at all, under which circumstances it would be manifestly unjust to permit recovery or another trial. (Oganaso v. Mellow, 356 Mo. 228, 201 S. W. (2d) 365; Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S. W. (2d) 333; Fletcher v. North Mehornay Furniture, 359 Mo. 607, 222 S. W. (2d) 789; Nelson v. Kansas City, 360 Mo. 143, 227 S. W. (2d) 672.) We have also applied it to improper argument injecting prejudicial matters outside the record (Leaman v. Campbell 66 Express Truck Lines, 355 Mo. 939, 199 S. W. (2d) 359); to bring up an actual judgment omitted from the record (Feigenbaum v. Van Raalte, 356 Mo. 67, 201 S. W. (2d) 283); and to consider basic questions on the right of recovery defectively raised. (In re Duran, 355 Mo. 1222, 200 S. W. (2d) 343; Kindred v. Anderson, (Mo. Sup.) 209 S. W. (2d) 912.) However, this is an equity case in which we may review the record de novo and give such judgment as the trial court should have given. Moreover, we are convinced that a temporary receivership was required and that at least one of these corporations must be liquidated by sale of its assets or business. We, therefore, think that the substantial rights of the parties can be better preserved and injustice prevented by a final decision now, rather than by a re-trial of the whole matter on the merits. We rule that the matter of disqualification of the trial judge has not been properly preserved for appellate review.

These two corporations were formed to continue the manufacturing business operated for many years by the father of plaintiff and defendant. They made and sold railroad and contractors' equipment. The record is not clear as to the details of their organization but ap-

·parently after their father died the business was in receivership. Handlan, Inc. was incorporated in 1932 with $5,000.00 capital. There was evidence showing that this was furnished by defendant's wife, Ella M. Handlan, but that she had been fully repaid for this and other advances to this company. Anyhow, neither plaintiff nor defendant put up any money and the capital and substantial surplus of this company is all earned. Handlan, Inc. is a selling organization. It is the sole sales agent for the products manufactured by Handlan-Buck and it also sells products of other manufacturers. The sales for Handlan-Buck are designated on its books and statements as "shop sales", while the sales for others are designated as "jobbing sales". Apparently Handlan, Inc. was formed to carry on this sales business before plaintiff and defendant acquired the manufacturing business. Handlan-Buck was incorporated in 1935. Plaintiff and defendant gave a joint note for $200,000.00 for its assets and some other real estate. This purchase price seems also to have been mostly paid off from the earnings of the business. Its capital is $100,000.00 and this was paid for by delivering to the corporation some of the assets purchased by them. It owns considerable real estate, including a new modern factory building and a warehouse which it rents to Handlan, Inc. The offices of both companies are in the factory building. Plaintiff and defendant jointly owned and managed the real estate that was not transferred to either company.

In 1946 defendant was president of both companies, with an annual salary of $12,500.00; plaintiff was a vice-president of both with an annual salary of $12,000.00; and A. H. Handlan, Jr. was secretary of Handlan-Buck and a vice-president of Handlan, Inc. with a monthly salary of $450.00. All of these salaries had been lower prior to the war years. Both companies have shown substantial profits, after taxes, every year since 1940. When E. K. Handlan went to work in 1946, he started at $280.00 per month. In 1946, Handlan, Inc. had three vice-presidents, the third being George T. Carmody, who was comptroller of the companies. Carmody was also shown as being elected a vice-president and director of Handlan-Buck but no stock was ever issued in his name. The secretary of Handlan, Inc. was Leo J. Trudell, who worked with Carmody in keeping the books of the companies and he was apparently also a director of Handlan, Inc. in 1946. Defendant completely managed the business throughout the whole period of the existence of these companies from 1932 to 1946. He came early in the morning and stayed until closing time every day, except while he was away on vacation, when he usually went to a lodge on Current River near Doniphan, which belonged to plaintiff and defendant jointly. Defendant had started in his father's manufacturing business in 1891, at the age of 16, and it is clear from the record that his management was an important factor in the financial success of these companies. (Plaintiff started in the business about

ten years later, although he had done some work there before enlisting for service in the Spanish-American War.) It also seems clear that defendant's son A. H. Handlan, Jr. did not have any responsible part in the management and he did not put in many hours on the job. What part plaintiff had is not clear. He was usually at the factory about three hours in the morning but did not often come back in the afternoon. However, he did contact railroad officials and other customers at their offices and was sometimes sent on trips to other cities to see them.

Much of the long record in this case, of almost 3000 pages of evidence and exhibits, is taken up with details of matters which would not be sufficient to authorize the appointment of a receiver and which mainly show plaintiff's dissatisfaction and disagreement with defendant's management, policies and methods of operation, much of which is based on hindsight. Defendant did manage the business as he saw fit, very much as if he were the sole owner, and did not ask for or follow advice from plaintiff. He said in his testimony that the other directors had "no knowledge of the operation or interests in the business." He expressed his feeling that he had operated it properly and efficiently, that he had developed and built it up, and that he had really given plaintiff his share in it solely as a result of his own efforts but had not received much help from him. There are specific findings in the decree about these and other matters which we summarize together with some high points of the evidence.

Labor relations: Defendant had an antagonistic attitude toward employees and their unions. However, there had only been one strike (in the summer of 1946), when the unions wanted the 18½¢ per hour increase which the steel companies and many other corporations had given to settle the nationwide strikes of that year. This ▮▮▮ strike was settled by plaintiff and Carmody while defendant was at Current River, by allowing the increase asked with an incentive bonus plan which defendant later discontinued. (Defendant did not want this settlement made.) It was shown that the plant employees were in a C. I. O. Union and the warehouse employees in an A. F. L. Union, and that contracts were made with them annually. There is no evidence that defendant opposed the organization or continuance of these unions. He dealt with them entirely through Carmody.

Complaints were made by employees about safety conditions, lack of masks, guards on machines and motors and lack of heat in the factory. Reports and recommendations of state and city inspectors were ignored.

A War Labor Board Panel in 1943 directed that a discharged foreman in the Press Department should be reinstated with one-half of his back pay for five months time lost and the methods and organiza-

tion of the business criticised as confused and antiquated. Defendant would not read this report but the foreman was reinstated and is still on the job. Defendant had Carmody handle all negotiations, and would not meet with employee's representatives himself, but did not give him any authority to make decisions and would often overrule his recommendations.

Treatment of Plaintiff: Defendant at times would not speak to plaintiff and failed to introduce him to representatives of other firms with which they were doing business. Defendant did not consult him about the operation of the business.

Operation of the business: Defendant refused to purchase steel and other raw materials in large quantities (car loads) at times when plaintiff thought operations would have been more economical by doing so and this caused cancellation of orders for lack of material. Defendant harassed shop superintendents and other supervisory employees, causing frequent changes (shop superintendents, eleven in five years) (warehouse superintendents, nine in five years) (expeditors, thirteen in six years); that he cut down the number of shop employees when they were behind with their orders; and that his policies caused too great labor turnover and deterioration of morale. Defendant used funds (about $2,000.00) for experimentation (on an electric railroad lantern) which brought no results.

Other complaints against defendant concerned personal use of an automobile owned by the company and driven by a company employee; paying for a caretaker and other maintenance costs at the Current River Lodge (owned jointly by plaintiff and defendant); having a gate and railing made for his home from company material by company workmen; allowing a scrap pile of old tools and material to accumulate in the factory (defendant had workmen get tools and parts from this scrap pile instead of buying new); getting into controversies with sales representatives of the companies over commissions and allowances, at least one of which resulted in a lawsuit settled by the receiver and another lost a good customer; paying for a club membership and liquor from company funds; and refusing to allow any dividends to be paid. Defendant is also blamed because the Handlan, Inc. gross sales decreased after reaching a high point of $1,238,195.85 in 1941; (1942—$1,220,368.82; 1943—$1,161,596.78; 1944—$1,045,988.22; 1945—$941,463.67; 1946—$814,204.79.) Profits after taxes for Handlan, Inc. varied from $26,915.12 for 1941 to $16,335.44 for 1946. (Handlan-Buck profits after taxes varied from $19,296.96 in 1941 to $15,420.18 for 1946.) Of course, war conditions and the 1946 strike very likely had some effect on sales and profits.

The statements of these companies, just before receivership and the receiver's statement at the end of the next year were as follows:

| HANDLAN, INC. ASSETS | Jan. 31,1947 | Jan. 31,1948 |
|---|---|---|
| *Current Assets* | | |
| Cash | 32,563.63 | 9,491.78 |
| U. S. Bonds | 55,073.44 | 106,414.77 |
| Accounts Receivable | 102,668.57 | 76,141.85 |
| Inventory | 34,702.10 | 72,918.44 |
| Joint Venture Acct. (A. H. Handlan) | | 37.87 |
| | 225,007.74 | 265,004.71 |
| *Fixed Assets* | | |
| Machinery & furniture (Less depreciation) | 858.06 | 1,065.92 |
| Patents | 342.87 | 304.63 |
| *Other Assets* | | |
| Prepaid Insurance & Taxes | | 1,343.47 |
| Shipping & Stationery | 1,106.09 | |
| Other Prepaid Expenses | 1,389.05 | |
| Shipping Supplies | | 2,636.45 |
| Office Supplies | | 1,365.38 |
| Accrued Interest, U. S. Bond | | 1,140.63 |
| Total Assets | 228,703.81 | 272,861.19 |

| HANDLAN, INC. LIABILITIES | | |
|---|---|---|
| *Current Liabilities* | | |
| Accounts Payable | 76,374.40 | 24,828.40 |
| Other Accrued Accounts Payable | 4,970.67 | 1,017.19 |
| | 81,345.07 | 25,845.59 |
| *Other Liabilities* | | |
| Silver Dam Realty & Mining Company (Money received for account of Mining Co., owned by Plff. & Deft.) | | 6,061.38 |
| Handlan-Buck (For purchases of factory products—balance due) | | 47,000.75 |
| 1947 Federal Income Taxes Payable | | 17,080.56 |
| *Capital Stock and Surplus* | | |
| Capital Stock | 5,000.00 | 5,000.00 |
| Surplus | 142,358.74 | 142,575.04 |
| Net Profits | | 29,297.87 |
| Total Liabilities | 228,703.81 | 272,861.19 |

| HANDLAN-BUCK ASSETS | Jan. 31, 1947 | Jan. 31, 1948 |
|---|---|---|
| *Current Assets* | | |
| Cash | 21,731.23 | 4,199.83 |
| Inventory | 31,525.39 | 113,151.63 |
| Accounts Receivable | 63,657.51 | 47,000.75 |
| Personal Account—A. H. Handlan | | 8,421.44 |
| Personal Account—A. H. Handlan, Jr. | | 553.71 |
| | 116,914.13 | 173,327.36 |
| *Fixed Assets* | | |
| Factory Building | | |
| (Less Depreciation—1948) | 40,576.99 | 28,911.67 |
| Machinery and Equipment | | |
| (Less Depreciation—1948) | 15,386.01 | 3,983.05 |
| Furniture and Fixtures | | |
| (Less Depreciation—1948) | 957.55 | 581.78 |
| Land-Factory and Warehouse Site | 28,600.88 | 28,600.88 |
| Warehouse Building | | |
| (Fully Depreciated—1948) | 19,328.44 | —0— |
| Dies and Patterns | | |
| (Fully Depreciated—1948) | 838.55 | —0— |
| *Other Assets* | | |
| Patents | 9.16 | 7.34 |
| Prepaid Insurance and Taxes | 3,912.92 | 2,215.01 |
| Compensation Insurance Deposit | | 2,000.00 |
| Good Will | 16,277.48 | 16,277.48 |
| Total Assets | 242,802.11 | 255,904.57 |

HANDLAN-BUCK LIABILITIES

| | | |
|---|---|---|
| *Current Liabilities* | | |
| Accounts Payable | 7,805.69 | 3,736.72 |
| *Other Liabilities* | | |
| Income Taxes Payable | 4,890.32 | 24,285.09 |
| Depreciation Reserve— | | |
| Furniture & Fixtures | 627.37 | |
| Depreciation Reserve— | | |
| Warehouse | 19,328.44 | |
| Depreciation Reserve— | | |
| Factory | 10,139.37 | |
| Depreciation Reserve— | | |
| Machinery & Equipment | 10,912.66 | |
| Depreciation Reserve— | | |
| Dies & Patterns | 838.55 | |

*Capital Stock and Surplus*

| | | |
|---|---|---|
| Capital Stock— | | |
| ($100,000.00 authorized) | 77,286.72 | 100,000.00 |
| Surplus | 110,972.99 | 88,259.71 |
| Net Profit | | 39,623.05 |
| Total Liabilities | 242,802.11 | 255,904.57 |

It is intimated that defendant may have built up Handlan, Inc., in which he and his wife owned 60% of the stock, at the expense of Handlan-Buck; but this is speculative so far as evidence is concerned. Handlan, Inc. had the largest surplus, $142,575.04, (Handlan-Buck $88,259.71) and much of its assets were in cash and government bonds. However, Handlan-Buck had the largest net worth and much smaller debts. (Neither company had any long term debts.) The excess of assets over liabilities (except capital and surplus) of Handlan, Inc. was $176,872.91 and of Handlan-Buck $227,882.76. Furthermore, Handlan-Buck had fully depreciated its warehouse and its dies and patterns and had built up large reserves for depreciation of its factory, machinery and equipment. These figures are from the receiver's statement and do include the actual value of the depreciated assets of Handlan-Buck. Handlan, Inc. bought all materials and supplies used by Handlan-Buck. Separate books were kept for the two companies; but decisions about which company would be charged for salaries of officers and some other expenses were often made after they had been paid, apparently for the purpose of minimizing taxes. The receiver found that the actual inventory of Handlan-Buck (which had been underestimated in several previous years) was much greater than shown in previous statements. Handlan, Inc. gross profits from its jobbing sales, over the entire twelve year period (1935-1947), was almost three times the gross profits from its sales (shop sales) of Handlan-Buck products.

Matters came to a head in 1946, apparently with plaintiff's efforts to bring his son E. K. Handlan into the business. After he had worked in the plant for a short time, defendant first ordered E. K. Handlan moved to the office; but he refused to leave the plant and defendant then had him discharged. Defendant also revoked plaintiff's authority to sign checks for the company. Plaintiff settled the strike at a directors' meeting he ordered held June 24, 1946 (attended by plaintiff and Carmody) during defendant's absence. At this meeting, plaintiff also approved the purchase of a $225.00 water cooler for the factory. When defendant returned he ordered this amount charged to plaintiff's personal account. On August 29, 1946, defendant called a directors' meeting which plaintiff refused to attend (only defendant and his son attended) and had plaintiff removed as Vice-President of Handlan-Buck and ordered all com-

pensation to him terminated August 31st. Plaintiff had previously made an agency contract without consulting defendant, for materials called vitro-bond and vitro-basic, intended to be used in high temperature furnaces. After sample orders of 8,000 to 10,000 pounds which were sold to prospective customers, plaintiff ordered a carload shipment which cost about $20,000.00. Defendant did not know this carload had been ordered and refused to receive it when it came, but it was finally accepted and paid for by the receiver. The salesman who sold the original orders said that this shipment was not of the same quality as the smaller amounts previously received and he had been unable to sell it. The purchase of this carload seems likely to result in a considerable loss.

After this suit was filed vigorous efforts were made by the attorneys for both parties to settle it and agree upon a plan under which plaintiff and defendant could continue to operate the business. Plaintiff also unsuccessfully attempted to get a buy or sell agreement from defendant. During the last part of December 1946 a plan for future operations was prepared by the attorneys and submitted to the parties in writing. This plan was discussed at a meeting on December 26, 1946 and it was understood by all present that defendant had agreed to it. The attorneys so announced to the Court and a minute entry was made on December 31, 1946 that the cause had been settled. Plaintiff and his son went back to work, as provided in the plan, on January 2nd, 1947. Defendant denied that he agreed to the plan or authorized his attorney to sign the agreement for him. He admitted that he did say, at the December 1946 meeting, it was a fine plan but he stated that he said it with much sarcasm in his voice. When defendant refused to put the plan in operation plaintiff and E. K. Handlan stopped going to the plant and the appointment of the temporary receiver soon followed. Thereafter, defendant's original attorney, John J. Nangle, withdrew from the case as his attorney. However, he continued in the case as attorney for the two corporate defendants.

Our corporation code (Sec. 4997.88 Mo. R. S. A.) provides: "Courts of equity shall have full power to liquidate the assets and business of a corporation: (a) Upon the suit of a shareholder when it is made to appear:

(1) That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof; or

(2) That the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent; or

(3) That the corporate assets are being misapplied or wasted."

This is broader authority than our Courts had under their general equity powers. (See Laumeier v. Sun-Ray Products Co., 330 Mo.

542, 50 S. W. (2d) 640, 84 A. L. R. 1435 and cases cited; 45 Am. Jur. 53, Sec. 57; Annotations 43 A. L. R. 288, 61 A. L. R. 1221, 91 A. L. R. 676. Our policy has been and should be "that courts should proceed with great caution in appointing receivers for corporations, and will do so only to prevent irreparable injury or to prevent justice from being defeated, and only when there is no other adequate remedy; that 'this great power ＊ ＊ ＊ ought to be exercised ＊ ＊ ＊ ordinarily only in cases of imminent danger of loss, or of damage or of miscarriage of justice' "; and that neither bad judgment nor past acts or derelictions of directors would alone authorize such relief. (Niedringhaus v. William F. Niedringhaus Inv. Co., 329 Mo. 84, 46 S. W. (2d) 838.) However, "Judicial hesitancy does not mean judicial atrophy or paralysis" and the directors' "corporate power (used) under color of office to effectuate a contemplated wrong may be taken from them when, by fraud, conspiracy or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril." (Cantwell v. Columbia Lead Co., 199 Mo. 1, 97 S. W. 167.) But in Ashton v. Penfield, 233 Mo. 391, 135 S. W. 938, we held (in a case of "Fraud and extravagant and corrupt mismanagement for personal and by-ends, long persisted in and still existing, whereby the rights of shareholders have been grievously hurt"; and "the truth hid away by bad bookkeeping") that the Court had no jurisdiction to dissolve the corporation and make distribution of its assets; but could only keep a receiver in charge "until such time in the future as the court may find full equity done and that it should then lift its hand and retire."

It is clear that, under the above provision of our new corporation code, our Courts can now go all the way and wind up the affairs of a corporation under proper circumstances. This power is in accord with the modern trend of the authorities. (See conclusions in annotation of this subject in 43 A. L. R. 317.) We think that it is a better remedy than for courts to undertake to run the affairs of corporations over long indefinite periods, as the decree in this case apparently intends. It would certainly be most unfair to do this indefinitely, wholly at the expense of defendant, as this decree provides. Therefore, while we find that receivership was necessary in this case, we order the decree modified in the following particulars.

I. *Liquidation of Handlan-Buck.*

In this case, it is obvious that there is a deadlock in the management of Handlan-Buck which the shareholders are unable to break since plaintiff and defendant each own half of the shares and they are in such violent disagreement as to business policies and methods. Apparently matters had reached the point where each of the brothers ignored the other in the management of the business and made decisions and took action, without consulting the other, knowing that the other did not agree to it. Certainly no business can continue to

be successfully operated on that basis. This deadlock had already caused loss to the company and we think the evidence shows that the continuance of this situation did threaten immediate irreparable injury to the corporation. Under the circumstances, it was in imminent danger of loss because of the disruption of its operations and personnel that would be sure to result from continuance of the bitter dissensions between the parties with equal right of control. No doubt, the matter was brought to a head because of plaintiff insisting on his son having a place in the business and defendant's insistence on being the head of the company and managing it according to his own ideas as he had always done. Anyhow, the matter was brought to a showdown which the parties could not settle themselves and which must be settled by the Court. The whole record is against any possibility of them working together in the future. The company could not continue to successfully carry on its corporate functions in this situation. The only solution is liquidation of Handlan-Buck and distribution of its assets. Since it has a successful going business, which should be preserved and continued, it should be sold as such if possible. Furthermore, if the parties can agree upon a sale of the interest of one to the other or to otherwise break the deadlock by any plan approved by the Court, they should be permitted to do so. The Court's decree should be modified to so provide and to require liquidation by sale, within a reasonable time, not to exceed six months, if there is no agreement between the parties.

## II. *Receivership of Handlan, Inc.*

The question is somewhat different as to Handlan, Inc. Plaintiff owns only ■■■■ 40% of the shares of this company (we think the Court was right in finding that plaintiff owned these shares as against defendant's claim that he owned none) while defendant and his wife own 60%. Obviously, the majority shareholders of Handlan, Inc. are able to break any deadlock in the management of that company by electing a majority of the Board of Directors. Therefore, it may not be necessary that Handlan, Inc. be liquidated. Handlan, Inc. was incorporated three years before Handlan-Buck was organized and apparently was in business successfully during that time. Its sales of other manufacturers' products (jobbing sales) have always been much larger than its sales of Handlan-Buck products (shop sales). It may be able to continue that business and it may be able to arrange to sell Handlan-Buck products with the new owners of that business, if that entire going business is sold and continued. While the two corporations have been interrelated in their operations, the evidence is that the accounting system of each has been excellent; that the books have been well kept and accurately reflect the affairs and condition of each; and that their assets, earnings and expenses have

been kept separate except that officers' salaries and some other management expenses have been charged arbitrarily between them. While these cannot now be unscrambled, it appears that they have been of advantage to the owners of both corporations from the standpoint of taxes. It also appears that the employees of Handlan, Inc. have done the office work for both corporations. We find the temporary receivership of this company was warranted because of the close interrelation of the two companies at the time and the critical situation, resulting from the violent dissension, then confronting them. Furthermore, the temporary receivership was not opposed by defendant and all parties seem to have recognized its immediate necessity. The receivership of Handlan, Inc. should be continued until the business of Handlan-Buck has been sold and the assets of that corporation liquidated. Thereafter, the receivership of Handlan, Inc. should be terminated and the management of the corporation returned to its owners as soon as the Court may find that it is ready to operate under the management of its own officers and directors and will be likely to operate free from illegal, oppressive or fraudulent conduct that would be reasonably certain to cause irreparable injury to plaintiff's minority interest therein by wasting or misapplying corporate assets. If it cannot so find it may then order that Handlan, Inc. also be liquidated. The decree should be modified to so provide.

### III. *Costs of Receivership.*

Plaintiff contends that, even without our statute, the Court had authority to appoint a receiver to prevent waste likely to result from the recklessness, unfairness, inefficiency and bad management alleged against defendant, claiming that his misconduct, mismanagement and oppression was of such a pronounced nature as to constitute fraud, citing: Ashton v. Penfield, 233 Mo. 391, 135 S. W. 938; Cantwell v. Columbia Lead Co., 199 Mo. 1, 97 S. W. 167; Bates v. Werries, 198 Mo. App. 209, 199 S. W. 758; State ex rel. Central States Life Ins. Co. v. McElhinney, 232 Mo. App. 107, 90 S. W. (2d) 124; Hornig v. Jones, (Mo. App.) 252 S. W. 981; Tebbetts v. Fuqua, 230 Mo. App. 330, 90 S. W. (2d) 1074; Price v. Bankers' Trust Co., (Mo.) 178 S. W. 745; Schneider v. Schneider, 347 Mo. 102, 146 S. W. (2d) 584; Robinson v. Nick, 235 Mo. App. 461, 136 S. W. (2d) 374; State ex rel. v. McQuillin, 260 Mo. 164, 168 S. W. 924; Fletcher, Cyclopedia Corporations, Vol. 16, p. 95; Corpus Juris, Vol. 14a, p. 955, Sec. 3171½; American Jurisprudence, Vol. 45, p. 48, ''Receivers,'' Sec. 51; Clark on Receivers (2d ed.), Vol. 1, pp. 1104, 1110. Plaintiff also says this justifies the Court's order in the decree that all costs of the receivership be adjudged against defendant. We do not agree with plaintiff's contentions and do not find the cases cited to be in point on the facts of this case. In the first place, defendant's record in managing these companies was one of success. Not only did his management

result in paying off all of the parties' original investment for purchase price and capital, but it has also built up a large surplus in each company. They have both annually shown substantial net profits after taxes both in peacetime and wartime and also have paid good salaries to both of the parties. Perhaps defendant was a hard taskmaster and not too pleasant to work with, but that is neither mismanagement nor oppression that would authorize a receivership. Perhaps also younger men using more modern methods could have accomplished more, but that is highly speculative and is certainly not grounds for a court to take over the management. Defendant had more than 50 years experience in the business and demonstrated that "he had something on the ball" by the results he obtained.

Furthermore, we do not think that all of the blame for the final deadlock can reasonably be placed on defendant. Plaintiff began in 1946 at least to take important action without consulting defendant who was still the President of both companies and had been managing them successfully. One of plaintiff's acts (the vitro commitment) appears likely to cause as much loss as the items of mismanagement alleged against defendant. Plaintiff appears to have previously been willing for defendant to manage the business and did not indicate such great interest in it or put in full time at it. He received liberal compensation for what he did. Apparently the disturbing element was the future of the sons of the parties in the business. Defendant may have been unreasonable about this and his son does not seem to have been of much help to the business. However, this personal difference between plaintiff and defendant did not amount to fraud, oppression or mismanagement and certainly was not good ground for a receivership.

"Courts generally are vested with large discretion in determining who shall pay the cost and expenses of receiverships. The court may assess the costs of a receivership against the fund or property in receivership or against the applicant for the receivership, or it may apportion them among the parties, depending upon circumstances." (45 Am. Jur. 224, Sec. 290.) This is a case in equity and we may consider the whole matter de novo. Defendant has imposed on him a considerable penalty by being removed from control and deprived of his annual salary of $12,500.00. (His son was also discharged by the receiver.) Plaintiff has been employed by the receiver at his former annual salary of $12,000.00 and his son has also been employed at a substantial salary. For the reasons above discussed, we cannot approve the decree of the trial court adjudging all costs of this proceeding and receivership against defendant. Neither can we sustain defendant's contention that all costs thereof should be adjudged against plaintiff on the ground that the appointment of a receiver was improvident and wrongful. We find that it would be equitable for the parties to share these costs in proportion to their interest in the

1170

corporations. The best way to do that would be to assess all costs against the property in receivership, the net income of these companies being ample to pay them. The decree should be modified to so provide.

**IV. *Accounting.***

The amounts found to be due from defendant ($8,421.44 to Handlan-Buck and $37.87 to Handlan, Inc.) and from A. H. Handlan, Jr. ($553.71 to Handlan-Buck) are not disputed and are affirmed. We also affirm the finding in the decree (from which plaintiff has appealed) that defendant not be required to account for amounts paid for club dues and liquor claimed to be used for entertainment of customers of the companies. However, we reverse the findings and orders in the decree that defendant account and pay the amounts expended for upkeep and maintenance of the Current River Lodge for the past five years and that defendant and A. H. Handlan, Jr. account and pay the amounts received by A. H. Handlan, Jr. in excess of $1200.00 per year for the last five years. (This was on the theory that the corporate minutes did not show authorization of any greater amount.) As to the Current River Lodge, defendant testified that it had been used to entertain customers of the companies and there was no direct evidence to the contrary. Plaintiff (in whose name title was held) had executed a deed conveying this property to Handlan-Buck but it was never delivered. Plaintiff knew what use was being made of this property and he also knew what salary was being paid to A. H. Handlan, Jr. He completely acquiesced in both and these contentions appear to be mere afterthoughts which would never have been raised except for the other difficulties between the parties. For the reasons stated in discussing the matter of costs, we think that it would not be equitable to require these amounts to be repaid to the corporations. The decree should be modified to so provide.

Defendant has also appealed from the allowance of attorneys' fees to plaintiff's attorneys ($10,000.00) and to John J. Nangle ($6,000.00) as attorney for the corporate defendants. The grounds urged are that the receiver was improvidently appointed and that Mr. Nangle was not authorized to represent the corporations. We have found the receivership necessary and find that Mr. Nangle was authorized to represent the corporations at the beginning of this suit and this was never revoked. Its continuance was approved by the Court. We find these fees were reasonable and their allowance is affirmed to be paid out of the property in the hands of the receiver.

The decree is affirmed as to all matters except as to those disapproved and ordered modified in Parts I, II, III and IV hereof; as to those matters it is reversed and the cause remanded with directions to enter a new decree to conform to the orders herein made.

We also order the costs on appeal equally divided between plaintiff and defendant, A. H. Handlan. All concur except *Hollingsworth, J.*, not sitting, because not a member of the court when cause .was submitted.