Scott **GOLDEN** et al., Appellants,

v.

**ST. JOSEPH MILK PRODUCERS' ASSOCI-ATION, a Corporation, Respondent.**

**No. 24570.**

Kansas City Court of Appeals.

Missouri.

Oct. 2, 1967.

Robt. H. Kendrick, Kansas City, for appellants.

R. A. Brown, St. Joseph, for respondent.

BROADDUS, Special Commissioner.

This is an action for equitable relief brought by stockholders or members of the St. Joseph Milk Producers Association. Plaintiffs' petition prayed that defendant Association be dissolved and that a receiver be appointed therefor. Findings of fact were made by the trial court and judgment entered in favor of defendant from which judgment plaintiffs have appealed.

The action was brought by approximately thirty members of the defendant corporation. It is admitted in the pleadings that the defendant was organized under the "Non-Profit Cooperation Marketing Law," now known as Chapter 274, of the Revised Statutes of Missouri, 1959, V.A.M.S., and that the corporation is governed by the general corporation code, except where the same is inconsistent with Chapter 274.

The defendant corporation is composed of some 290 members and is engaged in the business of a milk marketing cooperative. Milk produced by members is picked up from their farms by independant contractors using bulk over-the-road tanks owned by the Association. The milk is then brought to the St. Joseph Market area and delivered to the dairies, who are commonly referred to as "producers" and the operators of the trucks picking up the milk as "handlers."

The charges made by plaintiffs are contained in paragraph 5 of their petition, which reads as follows:

"The said Corporation is under the control of one Carl Dixon, Secretary-Manager of said Corporation, who individually and in concert with the directors of the said Corporation have performed acts illegal, oppressive and fraudulent, and have misapplied and wasted the corporate assets; that the said acts of the Secretary-Manager and the directors of said Corporation are in deprivation of the rights of plaintiffs as minority members of the said Corporation and have worked both beneficial and financial injury and damage upon the plaintiffs."

A general discussion of the law pertaining to an action of this kind will be found in 19 Am.Jur.2d at page 70, paragraph 533. It is stated that courts of equity will not, as a general rule, exercise jurisdiction to control or interfere in the management of the corporate or internal affairs of the corporation. The court has no power to interpose its authority for the purpose of adjusting controversies relative to the proper mode of conducting the corporate business. Errors of judgment on the part of the officers are not grounds for the interference of equity. For the court to intervene there must be actual or threatened acts which are ultra vires, fraudulent, and injurious, and are an abusive power, and are acts of oppression on the part of the Corporation or of its officers.

It is well settled that the courts should proceed with great caution in appointing receivers for corporations, and will do so only to prevent irreparable injury or to prevent justice from being defeated and only when there is no other adequate remedy. Niedringhaus v. William F. Niedringhaus Investment Company, 329 Mo. 84, 46 S.W.2d 828 l. c. 836; Handlan v. Handlan, 360 Mo. 1150, 232 S.W.2d 944.

Absent fraud a court will not substitute its judgment as to whether the acts of the corporation represent good business policy. Putman v. Juvenile Shoe Corporation, 307 Mo. 74, 269 S.W. 593, 40 A.L.R. 1412.

Plaintiffs state their first point as follows:

"The court erred in entering judgment in favor of defendant and against plaintiffs in that the undisputed evidence showed that the defendant established a 're-blending fund' from monies due plaintiffs in violation of the respective contracts of plaintiffs

as members of defendant association, which action was illegal, fraudulent and oppressive to plaintiffs, and constituted a misapplication of members' funds."

The testimony about the "re-blending fund" is voluminous and repetitious. It may be summarized in the following manner. Under the order of the federal market administrator, defendant must pay its producers a specified price. At times more milk is brought in by the producers on the local market than can be handled by the local market. This means that some of that milk must be dumped as a total loss or must be sold elsewhere. When it is sold elsewhere, it is sold at a lower price. In other words, it is sold at a price less than that which the defendant must pay the producer. It is at this point that the "re-blending fund" comes in, and it was established to take care of this precise situation and to make it possible for all producers to be paid the same price so that no one producer would suffer a hardship loss.

The testimony of Mr. Dixon relative to this fund is as follows: "Q. Do you have a fund called the re-blending fund? A. Yes, there is a re-blending fund. Q. Would you explain the re-blending fund? A. That re-blending fund is set aside to move the milk out of the market at times when we have too much milk and from the price as quoted to us by the market administrator a re-blending fund is determined if necessary to move that milk to a market where it is saleable. Q. In other words, if your members are producing too much milk for the amount needed by the handlers here on the St. Joseph market, then you take it to a different area and sell it, is that right? A. Yes. Q. And the cost of transporting the milk to this different area comes out of this re-blending fund? A. That is correct."

Plaintiffs make the argument that the membership agreement did not provide for the establishment of this fund.

Paragraph 6 of the membership contract specifically says that the Board of Directors may prescribe rules and regulations relative to the production and handling, testing, delivering, hauling zones and charges for services of others in the marketing of milk or dairy products produced by members and the member agrees to be bound by and comply with such rules and regulations. It further says that the Board of Directors shall have the right to adopt and enter into with others from time to time a marketing plan or plans for the marketing of milk or dairy products of member and other members of the association containing such provisions in relation to the production of milk or dairy products or the proceeds of the sale thereof, or equalizing cost of different distributors or price to different producers, or providing through variations in price incentives to producers to maintain a steady supply to meet market demands. It is further provided that the directors can do whatever is usual or customary in such marketing plans as may be deemed advisable by the Board, and the member agrees faithfully and punctually to comply with such plans.

Section 3 of Article I of the By-Laws, says that the corporation is formed to promote the general welfare of its members and the business of dairying and to have and to exercise all the powers necessary and proper to carry into effect the purposes for which the corporation is formed and to do any and all things incident to the above purposes. Section I of Article 4 of the By-Laws states that the corporate powers of the association shall be exercised and its business managed by the Board of Directors.

In the Agricultural Adjustment Act, Title 7, Paragraph 608c, Sub-paragraph (5) (F), it is specifically provided as follows: "Nothing contained in this subsection is intended or shall be construed to prevent a co-operative marketing association qualified under the provisions of sections 291 and 292 of this title, engaged in making collective sales or marketing of milk or its products for the producers thereof, from blending the net proceeds of all of its sales in all markets in all use classifications and making distribution thereof to its producers in

accordance with the contract between the association and its producers."

■ The contract thus specifically provided there should be equalization to take care of the situation, the By-Laws gave the Board of Directors the right to run the business and the federal law recognized the necessity of blending and legitimized it. This re-blending was for the benefit of all the producers and was neither fraudulent, illegal nor oppressive.

The trial court was correct in its finding that: "The re-blending price or charge was put into effect at a regular meeting of the Board of Directors and its objective is to make it possible for all producers to be paid the same price for their milk. The 're-blending fund' was established under the order of the Federal Market Administrator who also checked this fund each month. No complaint was made by any of the plaintiffs to this action of the Board of Directors until the institution of this suit."

Plaintiffs next contend that: "The court erred in entering judgment in favor of defendant in that the undisputed evidence showed that the defendant was guilty of fraud and oppressive mismanagement in failing and refusing to account to its members, including these plaintiffs, as to individual transactions between the defendant and its members and further, in violation of its by-laws, as to the general business of the corporation."

■ Here plaintiffs have commingled argument on several diverse matters. First they complain that a proposal was voted on and passed by the membership directing that reports be furnished to each member concerning the action of the Board of Directors at each meeting. They admit that this was done for a limited time, but was stopped, and no such reports have subsequently been furnished. The testimony concerning this matter shows that at an annual membership meeting a motion was passed that such reports be sent members. This was not a board meeting and at a regular board meeting the board directed that for the coming year these reports be sent out. This was done. Apparently no one was particularly interested and the practice was discontinued. No requests for these reports were made by any of the members thereafter. The complaint is wholly without merit.

■ Plaintiffs' next argument under the same heading is that the directors have not followed the By-Laws, in that they did not cause to be compiled each month a full and accurate statement of the business and conditions of the association, etc. There is not one word of testimony that these records were not kept, and, on the contrary, Mr. Dixon testified that they were. He said that any information any member wanted was always available at the office. There is not one word of testimony that any member ever inquired for these reports.

■ Plaintiff next contends that the "re-blending fund" was not accounted for to the membership at large. The testimony shows that the market administrator checked this fund every month, so obviously the records were available if anybody sought for them. As to the cases cited by plaintiffs, the broad rules announced therein cannot be denied, but they have no application here. All records any member wanted to see were available if the member simply asked to look at them.

■ Plaintiffs next turn to an argument concerning the sale of tanks to members at cost plus five per cent. The testimony on this is also quite voluminous. The facts are that defendant decided to help its members by offering to obtain these storage tanks for them. No one knew what the installation cost would be and quite significantly, no one knew what maintenance would be for the one year following the date of purchase, and this was to be included in the price. Maintenance was an item which defendant assumed. The directors authorized Mr. Dixon to offer these tanks to its members at cost plus five per cent. The facts are that the members wanted a set price and did not

want to guess about it. The five percent offer was not accepted by anyone, so Mr. Dixon gave the members a set price which was simply a guess. In some instances it was high, and in some, it was low. No member objected because they were getting a set price in the manner in which they wanted it. This was a managerial function which Mr. Dixon had a right to perform. He first made an offer that was ineffective, and then met the requests of the members. There was no objection, the action was neither illegal, oppressive nor fraudulent. No case is cited to the effect that this was an improper act and the finding of the trial judge that it was correct was eminently proper.

■ Plaintiffs last argument is that the court erred in entering judgment for defendant "in that the undisputed evidence showed that the defendant was guilty of gross mismanagement of the assets of the Association and of these Plaintiffs' funds."

Here again a number of charges are commingled under one point. It is first said that the course of action pursued by defendant was wholly opposed to the interest of the whole corporate entity and the case of Bates v. Werries, 198 Mo.App. 209, 199 S.W. 758, is cited. There is no similarity between that case and the present case and there is no legal pronouncement in the *Bates* case which applies to the instant case. That case had to do with an out and out fraud whereby majority stockholders tried to gain control of the company to the detriment of minority stockholders, and that is not the situation here.

Next the complaint is made that the bookkeeping has been of poor quality. At the time the case was tried an audit had been made by Gasper and Taylor, very competent CPA's, and testimony was offered from a representative of that firm, namely, Harold Thomas, and his testimony completely exonerated the defendant. The auditor stated that all records were available, everything could be reconciled, everything could be accounted for, and there were no irregularities of any kind or character. The auditor said that the books were kept in the same manner as many farm organization books were kept. The testimony further showed that new books had been set up under the guidance of the auditors and that they were being kept regularly and competently.

■ Next plaintiffs turn to the purchase by defendant of three plastic over-the-road bulk milk tanks to be used by haulers and they claim, in a vague way, that these purchases were improper. The evidence shows that when defendant first went into business it decided to purchase tanks which it would in turn lease to the haulers. The haulers would pay a sufficient price so that the corporation would be entirely repaid within nine years. When these purchases were first made, defendant inspected a number of tanks, took bids, and finally bought certain tanks. Thereafter, it bought certain plastic tanks without bids because the haulers asked for those specific tanks. This was a discretionary act by the Board of Directors and they had a perfect right to exercise their discretion. There is no testimony that one cent more was paid for these tanks than was proper, or that the tanks purchased were not adequate for the purpose for which they were designed. The tanks purchased were the ones requested by the haulers and, since the haulers were paying the price, they had a right to request the kind of tanks they wanted. There was nothing illegal or fraudulent about these acts.

■ Lastly, plaintiffs complain because defendant has investments in the nature of Certificates of Deposit at the Park Bank. The evidence shows that the Park Bank is located less than a block from defendant's place of business and was the sole and regular bank handling defendant's banking business. Defendant bought its Certificates of Deposit there in the exercise of its discretion and it had a right to do that. The inference is attempted to be drawn that because Mr. Dixon at a later time was an officer of the Bank, this was an improper trans-

action. There is not one word of testimony showing that the Bank gained any advantage of any kind or character, and the facts are, that at the time these transactions began, Mr. Dixon was not on the Bank Board. Again, there is nothing about these transactions which was illegal, oppressive or fraudulent in any sense, and no one has ever objected to them. The ruling of the trial court on this particular question was clearly proper and plaintiffs cite no authority to the effect that it was not.

The judgment was for the right party and should be affirmed. Your Special Commissioner so recommends.

PER CURIAM:

The foregoing opinion by BROADDUS, Special Commissioner, is hereby adopted as the opinion of the Court, and the judgment is affirmed.