Thomas N. CHURCHMAN, Appellant,

v.

Jerry M. KEHR, D.D.S., and Thomas N. Churchman, D.D.S., P.C., a Missouri corporation d/b/a Springfield Denture Center, and Jerry M. Kehr, individually, Respondents.

No. 17492.

Missouri Court of Appeals,
Southern District.

June 23, 1992.

David E. Schroeder, Fitzsimmons, Schroeder & Nelson, P.C., Springfield, for appellant.

Craig A. Smith, Daniel, Clampett, Lilley, Dalton, Powell & Cunningham, Springfield, for respondents.

CROW, Judge.

This is an action by Thomas N. Churchman, a dentist ("Dr. Churchman"), to dissolve a corporation created under "The Professional Corporation Law of Missouri," §§ 356.011–.261, RSMo 1986, as amended. The certificate of incorporation was issued December 4, 1986; the corporation's name is: "Jerry M. Kehr, D.D.S., and Thomas N. Churchman, D.D.S., P.C." It does business under the fictitious name: "Springfield Denture Center." The two incorporators were Dr. Churchman and Jerry M. Kehr, also a dentist ("Dr. Kehr"). Each owns 500 shares of stock.

Dr. Churchman commenced this action by filing a four-count petition September 12, 1990. Count I sought dissolution of the corporation per § 351.494, RSMo Cum. Supp.1990, which reads in pertinent part:

The circuit court may dissolve a corporation:

(1) ....

(2) In a proceeding by a shareholder if it is established that:

(a) The directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally because of the deadlock;

(b) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent;

(c) The shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired; or

(d) The corporate assets are being misapplied or wasted;

(3) ....

Count II was dismissed by Dr. Churchman before trial, hence nothing further need be said of it. Count III sought an injunction against Dr. Kehr "pending a judicial resolution of the dispute." Count IV prayed for a $50,000 judgment against Dr. Kehr.

On October 1, 1990, pursuant to a stipulation between the parties, the trial court entered an injunction restraining both Dr. Churchman and Dr. Kehr from certain conduct in the operation and management of the business.

A three-day non-jury trial ensued in December, 1990, producing a 691–page transcript. The trial court filed findings of fact and conclusions of law, and subsequently entered judgment January 23, 1991, dissolving the injunction of October 1, 1990, and denying relief on Counts I, III and IV of the petition. This appeal followed.

The five points relied on in Dr. Churchman's brief are easier addressed after a recital of the pertinent facts. In narrating them, we are mindful that on review an appellate court accepts as true the evidence and inferences from it favorable to the trial court's judgment and disregards contrary evidence. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654[2] (Mo. banc 1989). Any fact issue on which no finding was made is considered to have been found in accordance with the judgment. *Id.* at 654[3]. Credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part, or all

of the testimony of any witness. *Herbert v. Harl,* 757 S.W.2d 585, 587[1] (Mo. banc 1988).

Dr. Churchman and Dr. Kehr formed the corporation to practice general dentistry and to construct "one-day dentures." The plan was that at the outset, Dr. Churchman would practice general dentistry and Dr. Kehr would construct dentures. When the business increased to the degree that another dentist could be employed by the corporation to practice general dentistry, Dr. Churchman would begin constructing dentures. At that point, he and Dr. Kehr would work alternate months, each limiting his practice to constructing dentures. Each, during the month he worked, would be "in charge of the day-to-day operations," supervising all employees. Each hoped to ultimately draw $60,000 per year from the corporation, working six months per year.

The articles of incorporation provided the board of directors would consist of two directors, the first directors being Dr. Churchman and Dr. Kehr.

The first meeting of shareholders was held December 10, 1986, attended by Dr. Churchman and Dr. Kehr. They recognized themselves as the corporation's directors, adopted bylaws, and authorized the issuance of stock to themselves.

Immediately after the shareholders' meeting, Dr. Churchman and Dr. Kehr held the first meeting of the board of directors. Dr. Kehr was elected president; Dr. Churchman was elected secretary and treasurer.

The corporation hired an architect and built a building (the tract on which it was constructed had been purchased by Dr. Churchman and Dr. Kehr prior to incorporation). The corporation ultimately bought the tract from Dr. Churchman and Dr. Kehr. Dr. Kehr explained, "The accountant set it up so that we loaned the money to the corporation and the corporation repaid us so that we'd have a zero investment."

The corporation hired a staff consisting of Patricia Ann Dayton (dental assistant), Carolyn Naylor (receptionist), and Bonnie Sue Siler and Bob Leavy (denture laboratory technicians). The first patient was seen December 8, 1987.

On February 12, 1988, the corporation made an installment note payable to the order of Boatmen's National Bank of Springfield for $130,000. Inferably, it was secured by a deed of trust on the corporation's real estate. The corporation simultaneously made a second note to Boatmen's "in the $110,000 range." This note was purchased from Boatmen's by "Rural Missouri Development Company, in behalf of the SBA." Apparently, this note was also secured by a deed of trust on the corporation's real estate, subordinate to the deed of trust securing the $130,000 note. In connection with the two notes, Dr. Churchman and his wife signed a guarantee of the corporation's indebtedness to Boatmen's. Dr. Kehr signed a similar guarantee. Although not precisely explained in the record, it appears the proceeds of these notes were used by the corporation to pay off a "construction" loan by which funds had been acquired to erect the building.

At time of trial, payments on the $130,000 note were current; the principal balance had been reduced to $125,492.11. Inferably, payments on the other note were also current.

During 1988, the enterprise was operated as planned. Dr. Kehr constructed dentures, and Dr. Churchman practiced general dentistry. Dr. Kehr took charge of the advertising; Dr. Churchman balanced the checkbook at the end of each month and sent the necessary financial data to the corporation's accountant. Management decisions were made during informal conferences between Dr. Kehr and Dr. Churchman.

According to the evidence, only one dispute occurred that year. It concerned a telephone answering device purchased by Dr. Kehr without consulting Dr. Churchman. This caused Dr. Churchman to become "very upset." The dispute was resolved by engaging the services of a "professional answering service."

In December, 1988, Dr. Kehr began tutoring Dr. Churchman in the technique of constructing one-day dentures. This occurred each Wednesday beginning December 7, 1988, and extending through March 8, 1989. Dr. Kehr explained, "For approximately a month and a half he watched me, for about a month and a half I watched him."

In April or May, 1989, Dr. Churchman and Dr. Kehr agreed it was time to hire a third dentist and began interviewing candidates.

In July, 1989, laboratory technician Leavy quit, and Johnny Applegate was hired to replace him. Shortly after Applegate was hired, the corporation hired Bonnie Siler's daughter, Terri Siler, as a "trainee dental technician." The intent was that she "get some training to go to another lab." Her term of employment was some six months.

On July 20, 1989, Dr. Churchman and Dr. Kehr signed a "Cross–Purchase Agreement" giving each certain rights in the event the other undertook to sell his shares in the corporation to a third party.

Dr. Churchman and Dr. Kehr agreed on Dr. Gary Ledford as the third dentist. The corporation entered into a written employment contract with him August 14, 1989, and he joined the staff the next month. Dr. Churchman and Dr. Kehr thereupon began working alternate months constructing dentures. Dr. Churchman worked the first month (September). During that month, Dr. Churchman wrote the checks, supervised the employees, and "did the end of the month accounting."

Dr. Kehr worked the next month (October, 1989), relieving Dr. Churchman. The alternate month system remained in effect thereafter.

The year 1989 ended without acrimony. The corporation's gross revenue that year was $467,849.92. Dr. Churchman and Dr. Kehr netted some $59,000 each, consisting of salary and bonus.

In January, 1990 (Dr. Churchman's month to work), he took the staff to dinner. Dr. Kehr was not present. Later, according to Dr. Kehr, some employees told him "business matters" were discussed.

On Saturday, March 17, 1990, Dr. Churchman and Dr. Kehr met at a bank to sign the corporation's annual registration report and have their signatures notarized. As they departed, Dr. Kehr confronted Dr. Churchman about the January dinner. According to Dr. Kehr, he "suggested to [Dr. Churchman] that if he was calling the staff meeting I would like to attend."

A discussion ensued which, according to Dr. Churchman, lasted an hour and a half. Dr. Kehr recalled it was "30 or 45 minutes." Dr. Churchman described Dr. Kehr as "quite irate ... very angry about the whole thing."

Dr. Kehr's version was, "Dr. Churchman defended and refused to admit it was a staff meeting, he kept insisting it was strictly personal and that no business matters were discussed."

The relationship deteriorated steadily thereafter. Dr. Kehr changed a "bonus schedule" (an incentive plan for the corporation's employees) by raising the requirements for earning bonuses. According to Dr. Churchman, this was implemented without his knowledge. Dr. Kehr's version was that he had discussed the bonus plan with Dr. Churchman when it was initially established, and he (Kehr) had told Churchman he (Kehr) would eventually raise it.

Another issue arose when Dr. Kehr decided to rehire Terri Siler as a laboratory technician. Evidently, this decision was made in April, 1990 (Dr. Kehr's month on duty). According to Dr. Churchman, he objected because Terri Siler did not have the experience to be a "bona fide lab technician" and was the daughter of another employee (Bonnie Siler).

Dr. Kehr's explanation was that Johnny Applegate was a slow worker and needed help, consequently Terri Siler was rehired for that purpose. Dr. Kehr narrated: "I talked to [Dr. Churchman] ... and pointed out that [Applegate] was not improving, that he's working at the same speed and that unless it changed, I would have to find a replacement. [Dr. Churchman] wanted

to give him more time and I agreed that I would give him some more time."

Dr. Kehr recalled that on the last working day in April, 1990, Dr. Churchman said he "would buy me out, or force me out, or whatever."

On May 10, 1990, a lawyer representing Dr. Churchman met with Dr. Kehr. The lawyer stated Dr. Churchman wanted to buy Dr. Kehr's interest in the corporation and was willing to offer $112,000 or $113,-000. Dr. Kehr told the lawyer he (Kehr) had no desire to sell, as he liked the alternate month arrangement and had ten or eleven good years left to practice.

On May 15, 1990, Dr. Churchman's lawyer sent a letter to Dr. Kehr increasing the offer to $125,000.

Dr. Kehr consulted a lawyer, and thereafter offered to purchase Dr. Churchman's interest in the corporation on the same terms offered by Dr. Churchman.

Dr. Churchman rejected Dr. Kehr's offer to purchase Dr. Churchman's interest.

By this time (late spring, 1990), Dr. Churchman was no longer discussing the operation of the clinic with Dr. Kehr.

On August 15, 1990 (Dr. Kehr's month on duty), Dr. Kehr fired Johnny Applegate and hired Glen Harlow to replace him. Applegate reported his dismissal to Dr. Churchman the day it occurred. Dr. Churchman testified he (Churchman) was "very distressed" because Applegate was a first rate laboratory technician.

The next month (September, 1990) was Dr. Churchman's month on duty. He rehired Applegate without consulting Dr. Kehr. Applegate reported for work Tuesday, September 4 (the first working day that month). Dr. Churchman told the staff Applegate would work the month of September, and he (Churchman) told Bonnie Siler and Terri Siler to take a month's leave with pay.

Dr. Kehr arrived at the office a few minutes later. He told Applegate to leave the premises. Applegate refused, explaining he had been hired by Dr. Churchman, and Dr. Kehr should take the matter up with him. Dr. Kehr warned Applegate he would call the police and have them remove him.

Dr. Kehr confronted Dr. Churchman, stating he would summon police unless Applegate left. Dr. Churchman replied, "[T]hat's a mistake, don't do it."

Police officers swiftly arrived; they maintained order. A sergeant conferred with Dr. Kehr and Dr. Churchman, and suggested Dr. Kehr and the Silers leave. They did.

Dr. Churchman filed this suit eight days later.

Pertinent to the issues on appeal, the trial court's findings of fact and conclusions of law read:

> . . . .
>
> From the inception of the corporation until early 1989, the doctors operated more as partners. No meetings of the shareholders-directors have been held since the organizational ones.
>
> . . . .
>
> The evidence is that the directors and shareholders are evenly balanced and at odds. To require further evidence of a deadlock seems unnecessary.
>
> The evidence fails, however, to prove even the threat of irreparable damage to the corporation.
>
> The evidence also fails to prove the acts of the corporate president were illegal, oppressive or fraudulent.
>
> The actions of Plaintiff [Dr. Churchman] in September, 1990, may also justify withholding equitable relief.
>
> . . . .
>
> [I]f the doctors, or either of them, act beyond the scope of their corporate authority, injury to the corporation may be threatened. Hopefully, such will not occur or additional litigation may be required to restrain any such actions.
>
> I simply do not believe the use of the Court's extraordinary powers in equity to liquidate this corporation is warranted.

Dr. Churchman's first point relied on reads:

> The trial court erred in not granting a dissolution of the ... corporation be-

cause the evidence ... was sufficient to support an involuntary dissolution in that there was a deadlock in the management of the ... corporation, the shareholders were unable to break that deadlock and irreparable injury to the corporation was being suffered or threatened.

The point seeks to invoke § 351.494(2)(a), quoted earlier.

In considering the point, we note no party cites a Missouri case dealing with dissolution of a professional corporation. Our own research has yielded no such case.

We also note § 351.494, mentioned above, is not in chapter 356, The Professional Corporation Law of Missouri. Instead, that section is in chapter 351, The General and Business Corporation Law of Missouri.

However, § 356.031, RSMo 1986, reads:

The general and business corporation law of Missouri, chapter 351, RSMo, shall be applicable to a professional corporation organized pursuant to sections 356.-011 to 356.261.... All provisions of chapter 351 ... relating to the administration, enforcement, interpretation or amendment of chapter 351 ... shall be applicable to sections 356.011 to 356.261; except that, in all cases in which the provisions of sections 356.011 to 356.261 are contrary or inconsistent to the provisions of chapter 351 ... the provisions of sections 356.011 to 356.261 shall take precedence over such provisions of chapter 351....

We also observe there is a series of statutes in chapter 351 pertaining to "statutory close corporations" (§§ 351.750–.865, RSMo Cum.Supp.1990), and apparently a professional corporation may be a statutory close corporation. § 351.750.2, RSMo Cum. Supp.1990. Here, however, no party contends the corporation is a statutory close corporation, and the parties agreed during oral argument that the statute applicable to dissolution of the corporation is § 351.-494(2), RSMo Cum.Supp.1990. We shall proceed on that premise.

Dr. Churchman lists nine "facts" which, he says, demonstrate irreparable injury or the threat thereof to the corporation. We examine them seriatim.

Fact 1. Dr. Kehr's actions "committing the ... corporation to long-term billboard advertising obligations without consulting Churchman when a large percentage of the ... corporation's business did not come from such advertisement."

The corporation entered into agreements with an advertising company for four highway billboards: first, May 8, 1989, located on highway 65 at Chestnut Expressway in Springfield; second, April 11, 1990, located on interstate highway 44 near Joplin; third, July 9, 1990, located on highway 13 some four miles north of Springfield; fourth, August 6, 1990, located on highway 65 north of Branson.

Viewed favorably to the trial court's judgment, the evidence shows Dr. Churchman agreed with Dr. Kehr on the first two billboards, accounting for over half the total billboard cost. Dr. Kehr testified they planned to advertise with billboards because three million people visit Branson each year and if Springfield Denture Center had four billboards in different locations, many of the tourists would see them. He added that a dental publication maintains the source of patients is patient referral (first), Yellow Pages (second), and signs and billboards (third). The Joplin location was chosen because Springfield Denture Center's major competition is a denture facility at Mt. Vernon and eastbound travelers will see the Joplin billboard before reaching Mt. Vernon. Dr. Kehr avowed he would discontinue billboard advertising if it proved ineffective.

Fact 2. Dr. Kehr's "publicly announcing the disagreement regarding the management of the corporation which resulted in low morale and business interruption." In support of this averment, Dr. Churchman directs us to his testimony regarding the firing of technician Applegate by Dr. Kehr in August, 1990, and the confrontation September 4, 1990, between Dr. Kehr and Dr. Churchman at the Denture Center regarding Dr. Churchman's rehiring of Applegate. Technician Glen Harlow became upset and left as a result of the confrontation,

but returned to work the next day at Dr. Churchman's invitation. Harlow was still working for the corporation at time of trial, as were Bonnie Siler and Terri Siler. While Dr. Churchman testified there was stress and tension among the employees, the trial court was not obliged to believe that testimony. *Herbert,* 757 S.W.2d at 587[1].

As to alleged "business interruption," the evidence showed that as of November 30, 1990, the corporation's gross revenue for the year was $530,299.57. Dr. Kehr estimated December would add approximately $40,000, resulting in gross revenue for 1990 being about $570,000. As noted earlier in this opinion, the corporation's gross revenue for 1989 was $467,849.92. Dr. Kehr figured he and Dr. Churchman would each net $73,000 for 1990, compared to $59,000 for 1989. According to Dr. Kehr, "[W]e're having a very profitable year."

Fact 3. Dr. Kehr's "changing the bonus system and rate of pay of certain employees of the ... corporation, without consulting Churchman, resulting in low morale, animosity between employees and to Churchman and Kehr." In support of this averment, Dr. Churchman refers us to his testimony that Dr. Kehr changed the bonus system in April, 1990 (Kehr's month on duty) without consulting Churchman. As we comprehend Dr. Churchman's testimony, the original system gave employees (not the dentists) a $100 bonus if a month's production reached $27,000, a $200 bonus if production reached $32,000, and $300 bonus if production reached $37,000. Dr. Kehr changed it to a $100 bonus for $30,000 production, a $200 bonus for $35,000 production, and a $300 bonus for $40,000 production. This change, according to Dr. Churchman, was implemented without his knowledge, and occurred the month Dr. Kehr rehired Terri Siler. Dr. Churchman testified he found "[a]lmost chaos" in the office when he returned to work in May, 1990. He attributed this to the bonus change and to a pay raise Dr. Kehr had given Bonnie Siler—a $150–per–month increase, making her monthly salary $1,900.

As reported earlier, Dr. Kehr testified he discussed the bonus plan with Dr. Churchman from the beginning, explaining he (Kehr) was setting it up low and would raise it in the future. According to Dr. Kehr, that "seemed to be agreeable to [Dr. Churchman]." Dr. Kehr added that the corporation paid out the "third bonus level" the month the new system was implemented.

As to Bonnie Siler's raise, the trial court was not obliged to believe Dr. Churchman's testimony that this bred chaos among the other employees.

Fact 4. Dr. Kehr's "hiring and firing of specific employees without consulting Churchman, resulting in low morale, employee confusion and disruption of business." In support of this allegation, Dr. Churchman refers us to his testimony regarding Dr. Kehr's rehiring of Terri Siler over Dr. Churchman's objection and Dr. Kehr's firing of Johnny Applegate.

Dr. Kehr conceded Dr. Churchman was not in favor of relatives working for the corporation, but Dr. Kehr testified Dr. Churchman made no specific objection to rehiring Terri Siler as a laboratory technician. As noted earlier, Dr. Kehr testified he discussed the slow pace of Applegate's work with Dr. Churchman, stating he (Kehr) would have to replace Applegate unless he improved. According to Dr. Kehr, he gave Applegate another six months at Dr. Churchman's request. When Applegate demonstrated no improvement, Dr. Kehr fired him. Viewing the evidence favorably to Dr. Kehr, these events did not cause any significant low morale or confusion among the remaining employees, or disrupt the business.

Fact 5. Dr. Kehr's actions which forced Dr. Churchman "to work with employees he either did not want to work with or unable to work with employees that he did desire to work with." In support of this averment, Dr. Churchman refers us to a passage in Dr. Kehr's testimony where he was asked whether Dr. Churchman enjoys working with Terri Siler. Dr. Kehr replied, "I don't know." His testimony continued:

Q Do you know if Dr. Churchman enjoys working with Bonnie Siler?

. . . .

A I assume he does.

Q Do you know why he would have sent Bonnie Siler and Terri Siler home ... September 4 of 1990?

A I've never been able to figure out why he sent Bonnie and Terri home.

Q Could it have been because he didn't want to work with them?

A I guess, I don't know.

Q ... would you think those would be pleasant conditions to work under, working with someone you don't want to work with?

A Tom has worked with them before, why does he have an objection now? Bonnie has been with us from the very start, for three years.

This testimony does not support "Fact 5."

Fact 6. Dr. Kehr's "committing the ... corporation to expenses without Churchman's approval after Kehr was aware Churchman was dissatisfied with the current working relationship and the parties were deadlocked with respect to business decisions." In support of this allegation, Dr. Churchman refers us to a 90–page segment of his testimony, but does not identify any specific expenses. The testimony covers a multitude of subjects including the billboards (discussed earlier). The testimony also refers to a $1,044.76 contract with a sign company June 26, 1990, to manufacture and install signs on the Springfield Denture Center building. Dr. Churchman testified Dr. Kehr entered into the contract without consulting him.

Additionally, the testimony mentions a $944.47 contract August 14, 1990, for landscaping at Springfield Denture Center, and a $350 contribution to "The Festival of Lights" on October 30, 1990. Dr. Churchman testified Dr. Kehr incurred these expenses for the corporation without consulting him. However, Dr. Churchman conceded he had no objection "in principle" to the $350 contribution, as it was a community project.

As to installation of the signs on the Springfield Denture Center building, Dr. Kehr testified he had this done because the building is "not plainly visible from I–44, people were confused as to where we were located." Regarding the landscaping, Dr. Kehr testified he discussed the need for it with Dr. Churchman when they opened the clinic, but they could not afford it then. Dr. Kehr added, "[W]e decided to do it in three stages, this is the second stage." Dr. Kehr thought the Festival of Lights contribution was a good idea and "would help our business in the wintertime."

Dr. Kehr acknowledged he did not discuss these expenditures with Dr. Churchman. However, explained Dr. Kehr:

He refused to meet with me. I've had no opportunity to go over these things with him. I would like to have the opportunity to go over it with him.... I've had to run things basically by default because Tom has not been active.

Dr. Kehr also testified he believed there were things he and Dr. Churchman could agree on, and he (Kehr) remained willing to meet. Dr. Kehr's testimony included this:

Q Do you know of any present threat to this corporation by reason of the fact that Dr. Churchman's unwillingness to meet with you?

A No.

Viewed favorably to the trial court's judgment, the evidence is sufficient to support a finding that the expenses complained of by Dr. Churchman were reasonable and were for the purpose of enhancing the business of the corporation, and that Dr. Kehr acted alone by necessity because of the estrangement between him and Dr. Churchman.

Fact 7. Dr. Kehr's "discussing the deadlock and disagreement with the ... corporation's banker, which risked a possible credit classification." In support of this averment, Dr. Churchman cites Dr. Kehr's testimony that he (Kehr) asked a vice president of Boatmen's National Bank of Springfield (holder of the corporation's $130,000 note) to "talk to [Dr. Churchman] and reason with him to try to prevent [him] from going ahead with the threat of liqui-

dating the corporation." We find nothing in the cited testimony of Dr. Kehr regarding a "possible credit classification."

The bank's vice president testified. We have studied his testimony. Asked about the status of the note, the banker replied: "Perfect pay record. Absolutely no problem." The banker learned of the disagreement from Dr. Churchman. The banker wanted to remain neutral and, in event of a "split-up," wanted to be the banker for both Dr. Churchman and Dr. Kehr. The banker thought the alternate month work arrangement was unique, but added, "[T]heir pay record has been excellent, I've never once had a problem with the receiving of payments, and the financial statements that I have received ... appear to be profitable statements...."

**Fact 8.** The resignation of "previous employee Applegate." Johnny Applegate testified he left Springfield Denture Center on November 15, 1990 (while this case was awaiting trial) and accepted a job at "3M."

On that subject, Dr. Kehr testified:

Q   How would you describe the general working environment among the employees and supervising doctors?

A   Since Dr. Churchman threatened to liquidate there's been a little tension in the office.

. . . .

Q   As a result of that little tension did—do you know if John Applegate left the employment of Springfield Denture Center?

A   Yes, he's working for 3M Corporation.

Q   And as a result of that little tension do you know if Glen Harlow is going to continue to be employed by Springfield Denture Center?

A   If Glen does a good job, I'll keep him, yes.

Q   Does Glen do good work?

A   He does very good work when Johnny Applegate isn't there.

As in the previous seven "facts" listed by Dr. Churchman, nothing in "Fact 8" demonstrates irreparable injury or the threat thereof to the corporation.

**Fact 9.** Dr. Kehr's actions "justifying Churchman's reactions of giving the Silers a month off with pay." We gather from this averment that Dr. Churchman is contending Dr. Kehr's firing of technician Applegate in August, 1990, justified Dr. Churchman's giving Bonnie Siler and Terri Siler a month's leave with pay in September, 1990, and that this episode demonstrates irreparable injury, or the threat thereof, to the corporation.

The trial court was not compelled to find Dr. Churchman's action regarding the Silers was justified by Dr. Kehr's firing of Applegate. Viewed favorably to the trial court's judgment, the evidence shows Applegate's job performance was not equal to that of the other laboratory technicians. Inferably, the trial court viewed the evidence on the Applegate/Siler issue favorably to Dr. Kehr. As reported earlier, the trial court found Dr. Churchman's actions in September, 1990, may justify withholding equitable relief.

In sum, while the evidence undeniably establishes a personality conflict and considerable intransigence on the part of two skilled and successful professionals, it does not, when viewed favorably to the trial court's judgment, compel a finding that the corporation is threatened with, or suffering, irreparable injury. Absent such finding, the requirements of § 351.494(2)(a) are not satisfied.[1]

The primary case relied on by Dr. Churchman in support of his first point is *Handlan v. Handlan,* 360 Mo. 1150, 232 S.W.2d 944 (1950), an action to liquidate two affiliated business corporations. *Handlan* states courts should proceed with great caution in appointing receivers for corporations, and will do so only to prevent irreparable injury or to prevent justice from being defeated, and only when there

1.   Section 351.494(2)(a) can be satisfied, in the alternative, if it is established that the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally because of the deadlock. As we comprehend Dr. Churchman's first point, he does not claim the evidence met that requirement.

is no other adequate remedy. 232 S.W.2d at 950[3]. Such power should ordinarily be exercised only in cases of imminent danger of loss or damage, or of miscarriage of justice, and neither bad judgment nor past acts or derelictions of directors alone authorizes such relief. *Id.* at 950–51[3].

In *Handlan,* the Supreme Court found one of the corporations was in imminent danger of loss and irreparable injury because of the disruption of its operations and personnel that would be sure to result from continuance of the bitter dissensions between the parties with equal right of control. *Id.* 232 S.W.2d at 951. Even so, the Supreme Court held the company should be preserved and sold as a going business if possible. *Id.* The Supreme Court modified the trial court's decree to require liquidation by sale within a reasonable time, not to exceed six months, if the parties could not agree upon a sale of the interest of one to the other or otherwise break the deadlock. *Id.* With respect to the other corporation, the Supreme Court held the receivership should be continued only until the business of the first corporation had been sold and its assets liquidated. Thereafter, management of the second corporation should be returned to its owners as soon as the trial court found the second corporation was ready to operate under management of its own officers and directors and would be likely to operate free from illegal, oppressive or fraudulent conduct. Only if that goal could not be achieved would the second corporation be liquidated. *Id.* at 952.

Here, Dr. Churchman conceded he could sell his shares to another dentist, and there are professional sales organizations specializing in such transactions. Dr. Churchman had offered to sell his shares to Dr. Ledford for $160,000, but negotiations broke down because Ledford "couldn't handle it financially" and he (Ledford) wanted a "no-compete clause." Such a proviso was unacceptable to Dr. Churchman. Dr. Churchman stated Dr. Ledford expressed no reluctance to practice with Dr. Kehr.

Dr. Kehr testified he was willing to continue working with Dr. Ledford if he became a shareholder.

The personal guarantee of the corporation's indebtedness by Dr. Churchman and his wife would apparently present no insurmountable barrier to such a sale. The banker testified that if Dr. Churchman sold his shares to a dentist with a reasonably good financial statement, the banker would consider substituting the purchaser's guarantee for that of Dr. Churchman and his wife.

Given this evidence, together with the other evidence discussed earlier, we cannot convict the trial court of error in finding the corporation was not threatened with, or suffering, irreparable injury.

We have studied the other cases cited by Dr. Churchman in support of his first point. All involve business corporations, not professional corporations, and are factually unlike the instant case. They do not demonstrate trial court error here, and require no further discussion.

The complaining shareholder has the burden of proof to establish grounds for dissolution. *Fix v. Fix Material Co., Inc.,* 538 S.W.2d 351, 357[8] (Mo.App.1976). We are unpersuaded the trial court erred in finding Dr. Churchman failed to carry such burden regarding the "irreparable injury" ground. Dr. Churchman's first point is denied.

His second point avers the trial court erred in denying dissolution of the corporation in that the evidence was sufficient to establish "the cumulative acts of Kehr were oppressive to the rights of Churchman." This point seeks to invoke § 351.494(2)(b), quoted earlier.

Oppression suggests burdensome, harsh and wrongful conduct, a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members, or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely. *Fix,* 538 S.W.2d at 358. Determining whether actions are oppressive proceeds on a case-by-case basis. *Id.*

In support of his second point, Dr. Churchman relies on the same evidence cited in his first point. Dr. Churchman characterizes Dr. Kehr's conduct as a "squeeze-out." However, the same argument can be made regarding Dr. Churchman's conduct in refusing to discuss the operation of the clinic with Dr. Kehr after April, 1990, and his (Churchman's) actions in September, 1990, in the Applegate/Siler matter. It will be recalled that the trial court found the latter conduct may justify withholding equitable relief.

As noted earlier, Dr. Kehr testified he was willing to discuss the enterprise with Dr. Churchman, and he (Kehr) believed there were things on which they could agree. The trial court was free to believe that testimony, and inferably did.

The trial court could also have believed Dr. Churchman thought it would be to his financial advantage if the corporation's assets were sold at a liquidation sale. Dr. Churchman testified that if Springfield Denture Center was auctioned as a "going concern," he anticipated bidding on it.

As we have seen, the trial court found the evidence failed to prove Dr. Kehr's actions were illegal, oppressive or fraudulent. Dr. Churchman has failed to demonstrate error in that finding. Point two is denied.

■ Point three charges the trial court with error in refusing to grant a dissolution of the corporation in that the evidence was sufficient to establish Dr. Kehr "was misapplying or wasting the corporate assets." Virtually all of the evidence on which Dr. Churchman relies in support of this point has already been discussed. The only other corporate expenditures about which he complains were for other forms of advertising. Dr. Churchman contends the advertising was nonproductive.

While it is arguable that some of the expenditures could have been used for more effective advertising, the evidence did not compel a finding that the advertising chosen by Dr. Kehr constituted a misapplication or waste of corporate assets. Indeed, the overall advertising program must have been effective, as the corporation's gross revenue in 1990 was expected to be 22 percent above 1989, despite 1990 being the first full year of the alternate month plan. That is, the corporation generated more revenue in 1990 even though Dr. Churchman and Dr. Kehr worked fewer days. Point three is without merit.

■ Point four reads:

The trial court erred in failing to find a breach of Kehr's fiduciary duty to the Defendant corporation and to Churchman.

Respondents correctly assert the above point violates Rule 84.04(d), Missouri Rules of Civil Procedure (1992), which reads:

The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous. . . .

Point four yields no clue as to wherein and why the trial court's failure to find a breach of Dr. Kehr's fiduciary duty was erroneous. It therefore presents nothing for appellate review. *Thummel v. King,* 570 S.W.2d 679, 684–86 (Mo. banc 1978).

Dr. Churchman's fifth, and final, point relied on states no hypothesis of error, but simply avers we should enter such judgment as the trial court should have entered, viz, an order that the corporation be dissolved and a liquidating receiver be appointed to wind down the corporate affairs.

Having found no basis for reversal in any of the claims of error presented by Dr. Churchman, we affirm the judgment. *Morris v. Kansas City,* 391 S.W.2d 198, 200[3] (Mo.1965); *Lee Holding Co. v. Wentzville Oil Co., Inc.,* 409 S.W.2d 210, 215[11] (Mo.App.1966).

Judgment affirmed.

PREWITT, P.J., and MONTGOMERY, J., concur.

PARRISH, J., recused.