[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This appears to be a case of first impression in Connecticut in determining the fair value of a shareholder's interest being purchased pursuant to the terms of General Statutes § 33-900.[1] This matter came before the court in multiple counts by writ returnable on August 4, CT Page 14158 1998. The plaintiff Elsa L. Stone is a shareholder in the defendant corporation R-E-A-L Health, P.C. The other defendants, Linda A. Waidman, Alan Meyers and Richard F. Whelan are also shareholders in the defendant corporation. The individuals' shares, respectively, of 100 shares each, comprise a one-quarter ownership interest in the corporation. The plaintiff and the individual defendants are all pediatricians. In the first count of her complaint, the plaintiff brings an action or dissolution of the defendant corporation, pursuant to General Statutes §§ 33-896 (1)[2]. On September 4, 1998, the defendant corporation gave notice of the election to purchase the plaintiff's shares of stock in the defendant corporation pursuant to General Statutes § 33-900
(a). The court has bifurcated the case and has proceeded to trial of that proceeding, separate from the balance of the counts of the plaintiff's complaint and the counterclaims filed by the defendants. This matter is the court trial of count one pursuant to General Statutes § 33-900.
The statutory provisions of General Statutes § 33-900 (a) are: "in a proceeding by a shareholder under subdivision(1) of subsection (a) or subdivision (2) of subdivision (b) of section 33-896 to dissolve a corporation that has no shares listed on a national securities exchange or regularly traded in a market maintained by one or more members of a national or affiliated securities association, the corporation may elect or, if it fails to elect, one or more of the shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares. An election pursuant to this section shall be irrevocable unless the court determines that it is equitable to set aside or modify the election." The parties agree that the defendant corporation has no shares listed on a national securities exchange or regularly traded in a market maintained by one or more members of a national or affiliated securities association. The defendant corporation has made election to purchase all shares owned by the plaintiff, the petitioning shareholder. The court has not been asked to, nor does it, find it inequitable that such election has been made. Therefore, then, the determination placed before this court is what is the fair value of the plaintiff's shares in the defendant corporation.
The plaintiff brings this action claiming that as a part of the determination of the fair value of her shares, the court must consider all of the facts and circumstances surrounding her claims, including her position as a minority shareholder claiming: (1) to be oppressed, and, (2) that her reasonable expectations were frustrated by the defendants. The defendants claim that fair value is governed by the language of the parties' shareholder agreement, or, if not that, by the terms of the by-laws of the defendant corporation. If those arguments fail, the defendants claim that, in any case, the fair value of her shares, as a one quarter shareholder, is one quarter of the book value of the CT Page 14159 defendant corporation as of the valuation date.
The valuation date for the determination of the fair value of the plaintiff's shares is, ". . . as of the day before the date on which the petition was filed or such other date as the court deems appropriate under the circumstances." General Statutes § 33-900 (d). September 3, 1998, is the date before the election was made. However, the court will utilize August 17, 1998 as the most appropriate date for valuation. On August 17, 1998, the parties entered into a pendente lite agreement which effectively separated the plaintiff's business operations from those of the defendant corporation. Further, most of the financial data presented to the court terminates as of that date, or even sooner, at the quarter end of June 30, 1998. Section 33-900 provides no definition of fair value. The legislative history provides no discussion of the definition of fair value, either explicitly or inferentially. The provisions of General Statutes § 33-900 became effective January 1, 1997.
The determination of fair value made by the court, pursuant to §33-900 is to be entered in accordance with subsection (e): "Upon determining the fair value of the shares, the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate, which may include payment of the purchase price in instalments, where necessary in the interests of equity, provision for security to assure payment of the purchase price and any additional costs, fees and expenses as may have been awarded. . . . Interest may be allowed at the rate and from the date determined by the court to be equitable, but if the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, no interest shall be allowed. In a proceeding under subdivision (1) of subsection (a) of section 33-896, if the court finds that the petitioning shareholder had probable grounds for relief under said subdivision, it may award to the petitioning shareholder reasonable fees and expenses of counsel and of any experts employed by him."
The following facts are found. The plaintiff Elsa L. Stone, is a pediatrician licensed to practice in Connecticut. She has practiced pediatric medicine in North Haven since February, 1978. She has been very active in a number of professional organizations at both the local and state level. During the 1980's, she was actively involved with the New Haven Individual Practice Association, a contracting agency for physicians to assist them in their economic relationships with health maintenance organizations (HMO's). She served on the Board of Directors and was president of that organization for 5 years. She was on a task force with other New Haven area physicians which sought to preserve the power of physicians to negotiate with HMO's on behalf of patients. Through this task force, she worked with a consultant, Gary Freberg toward the CT Page 14160 construction of a corporate model for the delivery of health care which would provide the physicians the benefits and sense of power in being a part of a large diversified medical organization in dealing with the HMO's and insurance companies. The Individual Practice Association was not interested in utilizing this model. Therefore, Dr. Stone sought other physicians to join her in the creation of a corporation modeled on the corporate structure she had created with Freberg, known as Happy Health Care. The model had proposed by-laws, employment agreements and shareholder agreements ready for adaptation and use by any group Stone could manage to organize.
In the creation of this corporation, Dr. Stone turned to the defendant, Dr. Whelan first. She had known him for 18 years. Dr. Whelan practices pediatric medicine in North Branford. She also contacted the defendants, Dr. Meyers and Dr. Wallman, whom she had known for 10 years. They practice pediatric medicine in Branford. The office had originally been just Dr. Meyers. Dr. Wallman came in as an employee physician and, over time, became a partner with Dr. Meyers. The individual parties commenced discussion of the plaintiff's concept in early 1995. Ultimately, they resolved to create the defendant corporation, which was operational as of January 1, 1996.
The documents for the incorporation of R-E-A-L Health were provided by the plaintiff. The individuals' personal goals were to protect the integrity of their individual offices' pediatric practices. Even as it extended to off hours coverage, it was understood that they were not to take or invade each other's patients or practices. The parties had both long and short term goals, for the corporate creation, none of which became memorialized, however, in corporate minutes, articles of incorporation or other memoranda. They were, in the short term, to increase salaries, fund retirement benefits for the physicians and their employees, and hire another physician to work in all three offices. The long term goal was to grow to become a large multispecialty physician-owned entity that could continue to meet the short term goals and, also, develop a sufficient block of power to remove the feeling of powerlessness in dealing with the insurance companies and HMO's.
In the creation of the corporation, the shareholders had to determine how to set their respective salaries for the year 1996. They concluded that they should set them based upon their respective personal earnings in 1994. This resulted in Dr. Whelan starting at a higher salary ($220,000) than that of the other three physicians. Dr. Stone was not pleased starting at the 1994 level because it was a low year for her: she earned more in the previous couple of years. Her fellow shareholders agreed that her salary would start at $150,000, which was substantially higher than her $124,000 income for 1994. One of the goals of the CT Page 14161 shareholders was to equalize income within 3 or 4 years. In 1997 and 1998, Drs. Stone, Wailman and Meyers received salary increases from the corporation. Where there had been a $70,000 disparity in income to Whelan at the inception in 1996, that spread was reduced to about $30,000 with the income level set for 1998.
The corporation was capitalized and funded by each physician transferring the furnishings and medical equipment in their respective offices to the corporation. The book value of the assets contributed by Dr. Stone to the corporation, as of January 1, 1996 was $13,079.00. The four founding shareholders also provided initial funding for the corporation by loaning it their accounts receivables from a certain period with the provision that the funds were to be paid back with interest. The plaintiff has not received any repayment of her loan from her accounts receivables after December 31, 1996. Her balance due, as of that date, and carried to the present time is $23,002.22. The other shareholders are also due repayment of their respective loans from their accounts receivables.
Each of the four doctors signed a founder's employment agreement with the defendant corporation. In July, 1996, another pediatrician, Dr. Jay Harwin started employment with the defendant corporation; he had just completed his residency. He was not a founder, nor was he a shareholder. He signed an employment agreement with the corporation which was different that the agreement of employment of the individual parties in this matter. Initially, Dr. Harwin worked in all three office locations: North Haven (one day per week), Branford and North Branford. The board of directors (which was composed of the four individual parties in this action) decided that this was an ineffective use of his time in terms of developing a relationship with the patients; his schedule was reorganized so that he worked only in the Branford and North Branford offices commencing some months after his employment.
The plaintiff urged the individual defendants, all of whom were on the board of directors with her of the corporation, to support her in the hiring of an additional physician for the North Haven office. The plaintiff continued to press the idea of a new physician for the North Haven office. Meyers and Whelan both testified that they were prepared to have the corporation bankroll the startup of a new physician to work in North Haven with $100,000 of corporate funds to be allocated upon hiring. The plaintiff denies there was ever such an arrangement discussed. There exists no documentation confirming the proposed arrangement.
As of July, 1997, the corporation hired a pediatric nurse practitioner who worked part of the time in North Haven and part of the time in CT Page 14162 Branford. Generally speaking, pediatric nurse practitioners are profitable employees because of the nature of the services they provide for patients and the rates that those services are billed at. However, they work under the supervision of a physician. Therefore, while the plaintiff had the need for the services of a physician in her North Haven office from the inception of the corporation, that need became even more acute with the entrance of a second pediatric nurse practitioner in the office. While more patients could be serviced, the time investment of the plaintiff in her work was intensified.
Throughout 1996, plaintiff found that the office space she was operating out of was too small and outdated. She had maintained her professional offices there for many years prior to the inception of the corporation. In February, 1997, Stone requested that the corporation fund a move of her offices and received approval. The offices were moved at the end of 1997. The cost to the corporation for the furniture, office equipment and the build out in accordance with the office needs was $17,628.05. The funds for this were paid by the corporation.
In 1996, the corporation attracted another medical practice, Children's Medical Group (CMG), which practiced in Hamden. The practice included seven physicians, two of whom were their principals. The principals, Drs. Janis D. Cooley-Jacobs and Craig P. Summers, by a document entitled Amendment to Stockholders' Agreement, became shareholders of 100 shares of stock, each, of the defendant corporation, and, agreed to be bound by the original Stockholders' Agreement. The CMG employees, and its two principals, became employees of the defendant corporation as of July 1, 1996. While the plaintiff believes that employment agreements with the two principals were executed by them and the defendant corporation, that has been denied by Summers and Cooley-Jacobs, and, the documents have never been located by anyone. CMG, through its two original principals, decided to separate from the defendant company effective, December 28, 1996, a mere six months later. Further, notwithstanding the signing of the Amendment to the Stockholders' Agreement, Summers and Cooley-Jacobs, on withdrawal took the position that the actual transaction of their contribution of certain assets in exchange for the stock never occurred. This created a material ambiguity as to the method of withdrawal and separation of finances. CMG walked away with the same fixed assets of furniture and medical equipment that it had brought in, as well as their patient files and pediatric practice intact.
Summers and Cooley-Jacobs proposed a method of disentanglement of finances which amounted to offsetting certain direct and indirect expenses against revenues for the period that they were with the corporation. While this is a different method of separation than that provided for in the by-laws, the directors of the defendant corporation CT Page 14163 (the individual parties to this action) determined that it was in the corporation's best interest to accept the Children's Medical Group (CMG) methodology because they believed it would result in a net payment of funds to them by CMG. The defendant corporation consultant, Freburg had estimated that the payment due the corporation from CMG would be in the neighborhood of $100,000.00. Freburg's estimation was inflated. Ultimately, after haggling over the accounting, in July, 1997, the number was negotiated to a net payment by CMG to the defendant corporation in the amount of $10,052.27.
The conflict in the personalities of the respective directors (shareholders) and their respective views of their individual needs, the needs of their patients, and their views of the corporation created growing tension among them in the operation of the corporation. In the latter part of 1997, Meyers proposed that the corporation switch to functioning with a "pod' system of accounting. Under the "pod' system he envisioned, each office would be its own profit center rather than the system they had been living with which had all revenues and expenses pooled together at the corporate central location. He felt that decentralization would resolve much of the tension, which he perceived to be derived from a conflict over control issues. Whelan was opposed to the pod system for he felt that it would ultimately result in the demise of the corporation.
The plaintiff was strongly opposed to the pod concept. She felt it unfair since the other offices had the benefit of her office's contribution during the unprofitable start up time of Dr. Harwin since his hiring as of July 1, 1996. All who testified on the issue in this litigation agreed that there is an initial investment in a new physician; she does not begin to be profitable to the office for about 3 years. Stone asserted that it was unfair to convert to a pod system just when she would be hiring a new physician because then she would have solely shouldered the cost of underwriting those start-up years, instead of having the support of the other offices. The idea of the pod system was voted down at a November, 1997 board of directors meeting of the corporation.
Thereafter, the tensions intensified among the four individuals. It was particularly heightened as between the plaintiff and Meyers. In December, 1997 Whelan proposed that they sit down with a psychologist who works with business entities. All four approved of the idea, and Dr. Stone offered to find a psychologist to work with them. Utilizing her contacts at University of New Haven where she was pursuing an MBA, Stone found a psychologist, who, after interviews, all four agreed to work with. The four doctors met with the psychologist together and individually. He proposed several different resolutions to their conflicts. In March, CT Page 14164 1998, when the four physicians were together at a board of directors' meeting to discuss the proposals, both she and Meyers recommended that they disband. Thereafter, Stone contacted the corporate attorney to assist them with the issues surrounding such a disbanding.
At that meeting, on April 1, 1998, the plaintiff recommended to the other three doctors that they consider staying together. She stated that she wanted the name of the corporation to reflect her departure, the "E" in R-E-A-L to be removed, and she wanted to be made whole. This idea was not pursued further with her at that time. A short while later, the plaintiff reconsidered her position and told Whelan as much. He was not receptive to an entreaty be her to keep his office with hers instead. During this time, the plaintiff was interviewing residents in preparation of hiring a new physician to start on July 1, 1998. When she discussed this with the other four physicians in terms of the corporation hiring the physician until she completed the transition to being on her own; they were agreeable. However, she was not successful in hiring a physician at that time.
Subsequent to the April, 1998 board of directors meeting, the three individual defendants met with an attorney to discuss the situation. As a result of that meeting, they came to the conclusion that it was not a wise choice to dissolve the defendant corporation. By letter, their counsel communicated this position to the plaintiff on May 18, 1998, suggesting that they all make the best of the situation. The letter went on to say, "our expectations are that all of the physicians will continue to honor their contractual and fiduciary commitments to the corporations." Stone was stunned and shocked by this position and found it to be "totally dishonest." She took the latter statement in the letter to mean that she would continue to generate profit and they would continue to spend.
The plaintiff then scheduled a meeting of the board of directors of the corporation. That meeting was held on June 28, 1998. At the meeting all four directors were present, as well as the attorney for the corporation. At the meeting, certain business incidental to the operation of the corporation was conducted. New officers were elected. Dr. Waldman was elected president. Dr. Stone, the immediate past president, was nominated to the vice presidency. She declined the position. Dr. Stone moved the consideration of certain issues; however, she did not receive a second to her motions and therefore her motions died and the issues were not considered at the meeting. The issues the plaintiff had raised were hiring a pediatrician for the North Haven office, adjustment to her compensation, and receipt of a report from the accountant which analyzed the different offices as profit centers. CT Page 14165
No other activity occurred by and between the parties until the plaintiff filed her lawsuit that is the subject of these proceedings (as well as other claims briefly described above) along with a request for injunctive proceedings. Upon the inception of this action, the parties entered into a pendente lite agreement. That agreement made provision for several things, including the operation of the doctors' respective pediatric practices during the pendency of this action. The agreement was effective August 17, 1998. It provided that, as of that date, Dr. Stone would operate the North Haven office separate from the corporation. This meant that she was the sole owner of its present and future accounts receivable and accounts payable. In addition she agreed to pay $12,000 of corporate accounts payable that the corporate accountant attributed to the North Haven office. While she reserved her right to claim that these were not properly attributable, she has not done so as a part of the instant proceedings.
As a part of that agreement, the plaintiff acknowledged that the defendants intended to exercise their right to buy her out of the corporation and she agreed that she would not object to this and that she would no longer pursue a dissolution of the defendant corporation. She resigned as a director of the corporation and that resignation along with her endorsement over of her stock certificate is held in escrow pending a resolution of these proceedings. Agreement was made for the plaintiff to sublease the office at North Haven from the defendant corporation of a new lease could not be rewritten in her name. The "E" was agreed to be removed from the name of the defendant corporation. The corporation surplus of $57,000.00 which had been intended to fund the corporation profit sharing plan was held frozen until a hearing was held as to its disposition. The plaintiff sought its assignment to her to fund the hiring of a pediatrician; the individual defendants sought its use to fund the profit sharing plan. After hearing, the court ordered that the profit sharing plan (including accounts for the plaintiff and the individual defendants) be funded with the $57,000.00 surplus as of August 17, 1998.
The plaintiff argues that the court's rulings must take into consideration what she describes as the oppressive conduct of the other directors. These is no developed case law in Connecticut as to the meaning of `oppression' in this context. The legislative history of the law in Connecticut demonstrates a desire to consider the Model Business Corporation Act and its commentary as expressive of the intent of the legislature in passage of the act. In proceedings on the floor of the state House discussing the passage of the Connecticut version of the Model Business Corporation Act, which includes the sections at issue in this litigation, Representative Richard D. Tulisano stated: "I also wanted to put on the record that there are in fact commentaries that have CT Page 14166 been established which help one interpret this act, both at the Connecticut commentary and there is commentary to the model act that people should look to for reference and understanding of the intent of the drafters of the legislation. I also ought to be very honest that I have not read all of those, nor do I necessarily agree with all of those commentaries and for whatever that means for legislative purposes, certainly the proponents of the bill would like that to be looked at. It is probably the normal way of interpreting the legislation. In the future, it's the way the UCC was done and it's probably the way it should be done here." 3, 7 H.R. Proc., Pt. 18, 1994 Sess. p. 6446. The commentary instructs the court to consider the provisions of the shareholder agreement for the determination of fair value, unless to do so would be unjust or inequitable.
"If the parties are unable to reach agreement, any or all terms of the purchase may be set by the court . . ., and the court may find it useful to consider valuation methods that would be relevant to a judicial appraisal of shares under [ ]. . . . If the court finds that the value ofthe corporation has been diminished by the wrongful conduct ofcontrolling shareholders, it would be appropriate to include as anelement of fair value the petitioner's proportional claim for anycompensable corporate injury. In cases where there is dissension but noevidence of wrongful conduct, "fair value" should be determined withreference to what the petitioner would likely receive in a voluntary saleof shares to a third party, taking into account his minority status. Ifthe parties have previously entered into a shareholders agreement thatdefines or provides a method for determining the fair value of shares tobe sold, the court should look to such definition or method unless thecourt decides it would be unjust or inequitable to do so in light of thefacts and circumstances of the particular case.[emphasis added.]" ModelBusiness Corporation Act Official Comment to General Statutes §33-900.
The shareholders' agreement between the parties provides a method for the determination of the fair value of the shares of the plaintiff. The agreement was signed by the plaintiff as well as the individual defendants. It provided a formula which determined the amount to be paid to a departing shareholder for her shares of stock in the corporation, in the event of, inter alia, the termination of that physician's employment with the corporation. Such a termination occurred for the plaintiff, as of August 17, 1998. In fact the same formula would be used if plaintiff had remained in the employ of the corporation but sold her shares to it. Pursuant to the shareholder's agreement, the plaintiff is to be paid "an amount equal to the net book value of the assets contributed to the Corporation by the selling Stockholder as consideration for his or her Stock. The net book value of such contributed assets shall be computed as CT Page 14167 of the date such assets were contributed by Stone to the to the Corporation. Attached as Exhibit A is the agreed upon book value of the contributed assets."[3] The book value of the assets contributed to the corporation are $13,079.00. This sum, as representing book value of her contributions is undisputed. The schedule of assets prepared by the corporate accountant reflects this sum. The expert for the plaintiff acknowledged that the book sum was that amount, as did defendant's expert accountant. Pursuant to the terms of the agreement, that is the sum to be paid by the corporation to the plaintiff for her shares of stock.
An examination must be made as to whether this book value of contributed assets formulation is a fair and equitable manner and outcome for the fair valuation plaintiff's sale of her stock to the corporation. At the outset, it must be noted that the plaintiff never contributed her patient files or patient lists to the corporation. She retained ownership of them while with R.E.A.L. Health and took them with her when she left. Her ability to practice medicine was in no way impaired by leaving the corporation. Essentially, the corporation had no goodwill because it had none contributed to it by the founding doctors, and, it had not been in business long enough to establish its own goodwill separate from the doctors' individual practices. Plaintiff's own expert, Phillip DeCaprio acknowledged that there was no corporate goodwill and there was no customer based goodwill, because the doctors had retained it to themselves.
Plaintiff claims that she is entitled to substantially more than the book value of the assets she contributed to the corporation because she generated profits to the corporation that she earned by running the North Haven corporate office, and had she been on her own, they would have accrued to her benefit individually. Further she claims that the employment contract with Dr. Harwin's contract has value and she should be compensated for it. Her theory is that she had subsidized that contract when it was not profitable and now that it was over the start up period her fair value payment should reflect its real value as contributed to by her income subsidy to the start up of the physician within the corporation.
Plaintiff's expert has opined that the fair value of the plaintiff's stock is $338,916.00 as of October 11, 2000. This is based on his analysis that fair value should represent the sum of the following parts: the amount that it is asserted that the plaintiff subsidized the corporation from her activities ($232,237.00), the amount of the loan due from the corporation to her individually as a loan from shareholder's accounts receivables ($23,002.00), the value assigned to Dr. Harwin's contract ($40,000.00), less the amount the corporation invested in the new North Haven office ($17,628.00), for a total to bear interest at 10 CT Page 14168 per cent per annum from August, 17, 1998 forward.
It appears undisputed that the corporation owes the plaintiff $23,002.00 as the remaining balance of her loans of accounts receivable to the corporation. This is not however an asset contributed to the corporation. Instead it is a loan for which some repayment was made, which still has a remaining balance.
It is difficult to find the value in Dr. Harwin's contract. It contains no limitation in his ability to set up shop and compete in the towns that the corporation does business. It has a provision referred to as a covenant not to compete. It prohibits Harwin from soliciting or treating patients of the corporate practice for a period of six months from the termination of his employment. There is no value assigned to the contract or any of its provisions by any expert except the plaintiff's. Mr. DeCaprio assigns $40,000.00 as the value of the Harwin contract. He refers to a contract provision that if Harwin violates the covenant described above, he will pay the corporation liquidated damages of $40,000.00. Utilizing this sum as the value of the Harwin contract for purposes of determining the fair value of the plaintiff's stock, he then attributes the whole thing, all $40,000 to the sums he believes plaintiff should be paid for the fair value of her stock, notwithstanding the plaintiff's stock only representing a 1/4 interest in the outstanding shares of stock. Plaintiff's expert states he is utilizing this amount because Harwin is competing with the plaintiff This assertion is facetious and offers no sound basis for that manner of assignment of that value. Harwin is not doing business in North Haven, only in North Branford and Branford, and plaintiff does not seriously contend that those are areas she competes in for business. Further, the restrictive covenant in Harwin's contract does not bar him, in any case, from competing with plaintiff; he must not solicit or take her patients.
It is Stone's contention that she had no choice but to leave because the actions of the other shareholders were oppressive to her. She argues that this has deprived her of a return on her investment that she made in the corporation. It is her position that fair value should reflect that investment whether or not oppression is found. Plaintiff focuses on the analysis of profitability of the various offices of the corporation to support her contention that she has subsidized the corporation and therefore her efforts should be realized by a fair valuation that gives back to her the subsidy reflected in the profitability of the office she worked at. The North Have office for year ending December 31, 1996 showed profitability of $88,471.34, while North Branford for the same period showed a loss of $27,943.90 and Branford a loss of $72,675.11. For year ending December 31, 1997, North Haven showed profitability of $103,396.62, while North Branford showed a loss of $32,600.94 and CT Page 14169 Branford a loss of $100,693.71. Plaintiff, based upon these production figures felt she was under compensated while with the corporation and now, on her departure, asserts the fair valuation of her stock should reflect the fact that North Haven was a profit center while the other two offices did not demonstrate the same.[4] The total surplus that the plaintiff feels is attributable to her efforts in the North Haven office is $232,00. Her expert confirms this figure as representative of North Haven as a profit center that would have devolved to the plaintiff had she been on her own and not put the funds to corporate purposes. However, that is mere speculation. The corporate set up, as proposed by the plaintiff, and instituted since the inception resisted the notion of breaking down the different corporate offices into profit centers or as Dr. Meyers proposed, "pods.' Now, plaintiff claims it is inequitable to hold her to the bargain she proposed and made in the creation of the corporation and her proposal that they use the very documents, including the stockholders' agreement that she had brought to the table from her work with the Individual Practice Association and its task force. That the arrangement was not as good a bargain as plaintiff would now like does not make it inequitable. The principles of equity require the court to consider all of the circumstances that have brought the parties to this point.
Plaintiff claims that the court should find the defendant's ongoing conduct oppressive to her. The oppressive conduct she claims was the refusal to second motions at the June 29, 1999 meeting, frustrating her ability to have her voice heard, and, the failure to provide sufficient physician support to the North Haven office, resulting in great burden to her. Minority shareholder oppression ". . . is not synonymous with the statutory terms "illegal" or "fraudulent". The term can contemplate a continuous course of conduct and includes a lack of probity in corporate affairs to the prejudice of some of its shareholders." 16 Cardozo L. Rev. 501, *512. Oppression has variously been described as "burdensome, harsh and wrongful," Struckoff v. Echo Ridge Farm, Inc., 833 S.W.2d 463
Mo.Ct.App. 1992), Id. fn86, and "harsh and wrongful conduct, a lack of probity and fair dealing in the affairs of a company to the prejudice of some of, its members, or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder . . . is entitled to rely." Churchman v. Kehr, 836 S.W.2d 473, 482 (Mo.Ct.App. 1992) Id., fn.70. New York law has been held to find oppression of a founding minority shareholder where, "the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the joint venture." In re Kemp Beatley, 473 N.E.2d 1173, 1179
(N.Y. 1984).
The problem with the plaintiff's argument that she was oppressed is CT Page 14170 that, as a founder of the corporation, she acknowledged that it was working on the long term goal of putting the whole business on more sound footing by growing it larger to help insulate it from the HMO and insurance industry and the short term goals of increasing salary, fully funding retirement benefits for the doctors and staff, and hiring another physician to work in all three offices. The plaintiff participated in the decision that Harwin should only be working in two of the offices, after trying him until 1 November, 1996 in all three offices. That the investment in Harwin did not take care of the North Haven office needs in the short run of two and one-half years (1996 to mid-1998) does not make the bargain unfair. The timing of the plaintiff's departure, was before the investment had been made in the second physician. This was contemplated with the expansion into Wallingford. In August, 1997 the Wallingford lease was ready for the plaintiff's signature as president. She did not sign it because of the tensions in the corporation; she conferred with her colleagues and they agreed to put off the Wallingford expansion project. When the Wallingford project was put on ice, the plaintiff pursued her need for physician time in the North Haven office. To help alleviate the problem, in July, 1997 the North Haven office was given two more days a week of a nurse practitioner. In November, 1997 an attempt was made to hire a physician but it did not reach fruition.
Substantial correspondence from Dr. Whelan to the other three shareholders reflects his absolute understanding of the plaintiff's concerns. Whelan made suggestions, such as offering his time in the North Haven office in the short run to alleviate some of the physician need there. His philosophical alliance with the plaintiff on these issues surely as two out of four rendered her part of a substantial group and not a minority shareholder whose expectations were being ignored. The salaries of the four founding doctors, by their own contracts, was set by them. Plaintiff's income started substantially higher than had been originally planned and continued to rise. The goal of parity of income was substantially near completion when plaintiff chose to file this lawsuit. The corporation was funding a profit sharing plan in furtherance of the retirement planning goal.
Dr. Whelan had offered to work in the North Haven office for one of the five week days while a pediatrician was sought. Dr. Stone did not accept that proposal. The other three physicians approved of the one candidate that Dr. Stone proposed to work in the North Haven office. When that doctor did not take the job offer, Dr. Stone put no other candidates forward for consideration.
The conduct of the three defendants at the June meeting was foolish in terms of their refusing to allow reporting or second of motions of the plaintiff's, thus stifling the items she sought consideration of. The CT Page 14171 plaintiff was concerned that the defendants would cut her off from her office, paycheck, or otherwise undermine her ability to earn an income. ". . . . [T]he oppressive conduct must be "extremely serious' or . . . the oppressors must be "incorrigible'; . . . `vague apprehensions; of future mischief will not suffice." 65 Notre Dame L. Rev. 425, *457[5]
The plaintiff could not point to any act beyond this conduct at the meeting to support the reasonableness of her fears which impelled her to file the lawsuit underlying these proceedings. In fact, nothing at all adverse occurred after the meeting. This one meeting on its own, nor it coupled with the history of dealings the plaintiff had with the corporation, cannot be considered an adequate basis to find the plaintiff oppressed.
These four individuals were trying to find a way to work within their corporate framework through incredible tension. It could be suggested that the plaintiff took the first overtly hostile act at that meeting by rejecting the offer of the vice-presidency to her. That rejection set a tone as much as any other action at that meeting.
Further, the plaintiff was sending confusing messages to her colleagues by on the one hand rejecting the pod system and on the other hand seeking some special recognition by way of income for the profit production at the North Haven office.
The court cannot find that oppression has been proven by the plaintiff. There was not a history of unfair dealing with her nor were her reasonable expectations being suppressed by the corporation. That progress was slower than she hoped for may be so; however, her expectations were incrementally being met.
The plaintiff claims that it is inequitable to hold her to the shareholder agreement for the purchase of her shares when Cooley-Jacobs and Summers had been treated differently upon their departure from the corporation. However, the withdrawal of the CMG practice from R.E.A.L. Health was a factually dissimilar situation. Initially, it must be noted that Cooley-Jacobs and Summers were contesting whether in fact they had ever become shareholders since they claimed they never transferred assets to the corporation and never received stock. Therefore, the R.E.AL. Health board of directors (the plaintiff and the individual defendants) were faced with significant uncertainty if they desired to press the buy out provisions in the shareholders' agreement. Further when CMG proposed a different way to account for their withdrawal all four of the board of directors saw it in their financial best interest to vary from the agreement. That is factually dissimilar to the present situation: only the plaintiff deems it in her financial best interests to follow the CMG method of accounting to determine the fair value of her stock. CT Page 14172
The court does not find it inequitable or unfair under all of the circumstances to look to the stockholders' agreement for the determination of the fair value of the plaintiff's stock. The court finds that, as of August 17, 1998, the fair value of the plaintiff's 100 shares of stock is $13,079.00. The court finds that the plaintiff's failure to accept the payment of book value was based on her own good faith position in her position; therefore, interest is awarded pursuant to the statutory criteria. While an award of interest is made pursuant to General Statutes § 33-900 (e), the court declines to order that the plaintiff be awarded fees or expenses of counsel and experts for the court finds that, based on all of the facts found, the plaintiff lacked probable grounds for relief under General Statutes § 33-896 (a)(1)[6].
Pursuant to General Statutes § 33-900 (e), the defendant corporation is ordered to pay said sum of $13,079.00 in full, together with interest calculated at 10 per cent per annum from August 17, 1998 to the date of payment, to the plaintiff 30 days from the date of the filing of this decision. At that time, the plaintiff's 100 shares of stock currently being held in escrow, shall be surrendered to the corporation endorsed over by the plaintiff. Such resignations of the plaintiff from the corporation as are presently held in escrow or due to the corporation under the pendente lite agreement shall be turned over to the defendant corporation upon payment of the fair value of $13,079.00 together with interest to the plaintiff.
It is so ordered.
Lynda B. Munro, Judge