[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This lawsuit was filed on March 17, 1999 by siblings James and Cindy Johnson against their brother Randy Johnson, a closely held family corporation known as Johnson Corrugated Products Corporation (Corrugated), and two unrelated members of the corporation's board of directors, Peter Brooks and Edward Hanlon. As originally cast, the action contained five counts with the following claims: breach of fiduciary duty; dissolution of Corrugated pursuant to Connecticut General Statutes § 33-896 et. seq.; appointment of a corporate receiver pursuant to CT Page 11193 C.G.S. § 33-897 (c) and § 33-898; an accounting pursuant to C.G.S. § 52-401 et. seq.; and, an accounting pursuant to common law. By pleading dated May 27, 1999, Corrugated gave notice pursuant to C.G.S. § 33-900 of its election to purchase all shares of stock in Corrugated owned by the plaintiffs. In accordance with the dictates of C.G.S. § 33-900 (d), the court bifurcated the proceedings in order to determine the fair value of the plaintiffs' shares as of March 31, 1999, the stipulated date of valuation. The court conducted a valuation hearing on successive days in May, 2001. Based on the evidence, the court makes the following factual findings and orders.
The defendant corporation is a corrugated box manufacturing company with production and office facilities in Thompson, Connecticut. It was founded in 1964 by three individuals, including Melvin Johnson, the now deceased father of the Johnson litigants. Through various transactions subsequent to Melvin Johnson's death in 1974, Cindy and James Johnson each owns 7.8 stock shares, which, in combination, represents a 30.83% equity interest in the corporation.
The plaintiff Cindy Johnson received her shares free of trust in 1996. For several years she was employed by the corporation, first in production and later in the office. In 1994 she left on maternity leave. She testified that in 1997 she tried to resume her employment at the plant but that the defendant, Randy Johnson, blocked her return. Notwithstanding her absence since 1995, Cindy Johnson continues to be paid by the defendant under a 1992 employment agreement. In 1998 she received approximately $18,650 as W-2 earnings. Additionally, during her employment, the defendant corporation paid the tuition for her to improve her understanding of business matters. Ms. Johnson did not complete the course work. She is a high school graduate with several years experience as a production worker and some office experience. It is her view that her stock ownership entitles her to employment with the defendant corporation, to membership on the board of directors, and to a share of the corporate profits.
The plaintiff James Johnson began employment with the defendant corporation after he left high school in the 10th grade and continued for approximately 20 years until 1999. He has had various functions at the plant, mainly as a handyman and as a floater, filling in where needed. James, who suffered a traumatic head injury several years ago, feels that his father promised him he could always work at the company. Additionally, he believes he is entitled to be on the board of directors as a matter of birthright, and that as a shareholder and sibling of Randy, he should be on the board of directors and have a greater share in the company's profits. James also continues to receive wages from the corporation though he does not presently work there. CT Page 11194
Randy Johnson, either directly or through trust mechanisms in his control, owns 35 shares, representing a 70% interest in the corporation. He is the chair of the board of directors, chief executive officer of the company, and its majority shareholder. A high school graduate, he has no special educational qualifications for his position. During his testimony, however, he evinced substantial and detailed knowledge of the production process. Two years ago, Randy underwent brain surgery. He has been told that his cancerous condition is terminal.
It is clear to the court that the three siblings harbor significant longstanding animosity and resentment toward one another.
Under our statutory scheme, when a shareholder has brought an action to dissolve a corporation, the corporate defendant or other shareholders may elect to purchase the plaintiff(s)' shares. C.G.S. § 33-900
provides:
 "(a) In a proceeding by a shareholder under subdivision (1) of subsection (a) or subdivision (2) of subsection (b) of section 33-896 to dissolve a corporation that has no shares listed on a national securities exchange or regularly traded in a market maintained by one or more members of a national or affiliated securities association, the corporation may elect or, if it fails to elect, one or more shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares."
This is such an action. The plaintiffs claim under C.G.S. § 33-896
(a)(1) and (2) that the defendants have acted in a manner that is illegal, oppressive or fraudulent and that the corporate assets are being misapplied or wasted. Since the defendant corporation has made an election pursuant to C.G.S. § 33-900, it is the court's responsibility to determine the fair value of the plaintiff's stock. The parties have agreed that the valuation should be as of March 31 1999.
With respect to the valuation procedure, C.G.S. § 33-900 provides:
 "(e) Upon determining the fair value of the shares, the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate, which may include payment of the purchase price in installments, where necessary in the interests of equity, provision for security to assure payment of the purchase price and any additional CT Page 11195 costs, fees and expenses as may have been awarded."
Additionally, this section provides:
 "In a proceeding under subdivision (1) of subsection (a) of section 33-896, if the court finds that the petitioning shareholder had probable grounds for relief under said subdivision, it may award to the petitioning shareholder reasonable fees and expenses of counsel and of any experts employed by him."
In determining the fair value of the plaintiffs' stock, it is the court's task to first determine the equity value of the corporation. Once that is accomplished, the court must then consider whether or not to apply any discounts to the value of the company due to market conditions and any reduction to the value of the plaintiffs' shares due to their minority status. The court should also consider the issues of oppression and waste in determining the fair value of the plaintiffs' stock.
Both sides retained individuals qualified by their educations and past experiences as experts on business valuation, and both experts employed essentially the same valuation methodology. They utilized the income approach, capitalizing net free cash flow. Through this method, both experts sought to determine the present value, as of March 31, 1999, of the future net benefit the corporation will produce for its owners, with that future stream discounted to present value at an appropriate discount rate. The plaintiffs' expert, John Kramer, determined the corporation's value to be $8,070,000 while the defendants' expert, Walter King, found it to be $4,383,000. In the main, their conclusions differ because they disagree on three points: (1) the anticipated savings due to the installation and operation of a new corrugator; (2) the extent to which corporate income should be normalized to account for arguably excessive compensation paid to management and others; and, (3) the proper amount of depreciation.
As noted, the defendant corporation manufactures corrugated packaging products. It operates in a niche of the market most conducive to fulfilling small orders of varying shapes and sizes. During the fall of 1998, the company installed a new corrugator machine with the expectation that the new equipment would reduce labor costs and waste while increasing productivity. A review of the minutes of the board of directors reveals that management had projected annual savings of nearly $700,000. Based, in part, on these estimates and rooted in the belief that any reasonable investor would rely on these estimates in determining an amount to pay for the corporation, the plaintiff's expert, John Kramer, factored this savings into his valuation. The defendant's CT Page 11196 expert, Walter King, disagrees. From his review of the operation of the new corrugator for a period of the few months of its operation prior to March 31, 1999, Mr. King determined that the actual annualized labor and waste savings due to the corrugator were $60,000. In determining fair value, only factors that are known or knowable as of the valuation date can be considered. Having reviewed the minutes of the pertinent board of directors' meetings, it is the court's view that the anticipated savings of approximately $700,000 discussed by board members in conjunction with their decision to purchase and install the new corrugator was more the result of wishful thinking and speculation than reasoned analysis. Contrary to the plaintiffs' assertions, the court is unpersuaded that a reasonably prudent investor would have relied on the board's untutored projections for anticipated savings in determining a reasonable amount to pay for the corporation on the date of valuation.
The next area of discrepancy between Mr. Kramer and Mr. King relates to management compensation and the normalization of income. In determining what a reasonably prudent investor would pay for the corporation, one must consider the level of compensation one would expect to pay a non-owner chief executive officer. In this case, the benefits provided to Randy Johnson by the board of directors exceeded reasonable executive compensation. For the year ending July 31, 1998 Randy Johnson received total compensation of $333,536. While the court does not find that this level of executive compensation and prerequisites is tantamount to corporate waste, it represents more than a reasonably prudent investor would have to anticipate paying a competent non-owner chief executive officer. In support of their respective positions on this issue, both experts utilized executive compensation surveys. The court finds that the survey utilized by Mr. Kramer represents the better and weightier evidence. According to this data, total annual compensation of approximately $175,000 represents a reasonable level of compensation for a chief executive officer of a manufacturing company of this size and nature. The court adopts this amount as reasonable. Additionally, the court accepts as reasonable Mr. Kramer's testimony that $87,250 represents reasonable compensation for a vice president of finance.
In order to normalize earnings, both experts began by analyzing the corporation's reported earnings for a three year period ending July 31, 1998. The court finds that neither extrinsic market or economic conditions nor company-specific data supports giving any of the three years more weight than the other and, accordingly, believes that the years should be averaged to determine earnings before income taxes. With the noted exception of an add back of $700,000 for anticipated savings due to the new corrugator, the court accepts the normalization analysis provided by Mr. Kramer as more reasonable. The court accepts Mr. King's projection of $60,000 in anticipated annual corrugator savings as CT Page 11197 supported by the better and weightier evidence. Accordingly, the court finds the corporation's average annual normalized earnings before taxes to be $1,720,087. From this sum, the court deducts reasonable management compensation of $262,250 for a chief executive officer and financial officer and adds $60,000 in anticipated savings due to the new corrugator to arrive at normalized annual earnings before taxes of $1,517,837. Assuming, as did both experts, income taxes at an aggregate rate of 40%, the company's average normalized net earnings for the three year period ending July 31, 1998 were $910,702. The court accepts as reasonable Mr. Kramer's computations to convert normalized earnings to cash flow, involving the addition of claimed depreciation of $517,861, and subtraction of amounts for capital expenditures and a decrease in working capital, to arrive at net free cash flow of $944,443.
The next part of the analysis requires a determination of the capitalization rate so as to convert the anticipated future net cash flow to a present value. This involves a determination of an appropriate discount rate and the weighted average cost of capital. The court finds Mr. King's analysis in this regard to be persuasive. Accordingly, the court applies a capitalization rate of 7.69% to arrive at the sum of $12,281,443 as the value of invested capital. From this amount, the court deducts the interest bearing debt of $5,235,122 to arrive at the sum of $7,046,321 as the value of equity from operations. After factoring in the non-operating assets and liabilities of $72,596, the equity value of the corporation is $6,973,725.
A determination of the fair value of the plaintiffs' shares cannot be achieved by simply apportioning 30.83% of the corporation's equity value to the plaintiffs. Statutory language allows consideration of fraud, waste and oppressive conduct as well as the minority status of the shares being valued. Although the statutes do not explicitly define fair value, the court finds guidance in the Model Business Corporation Act's Official Comment to C.G.S. § 33-900 which states the following:
 "If the parties are unable to reach agreement, any or all terms of the purchase may be set by the court . . . In cases where there is dissension but no evidence of wrongful conduct, "fair value" should be determined with reference to what the petitioner would likely receive in a voluntary sale of shares to a third party, taking into account his minority status."
The plaintiffs argue that the fair value of their stock should be increased to take into consideration the defendants' oppressive and wasteful conduct. The defendants, on the other hand, claim that the value of the plaintiffs' stock is less than 30.83% of the corporation's total CT Page 11198 value due to their minority status and the limited marketability of the company's stock.
The court is unpersuaded by the defendants' marketability argument. Evidence of the financial records of the company and marketplace data suggests that the corporation enjoys a niche in the corrugated container production market. Additionally, in determining the value of the corporation, risk factors flowing from characteristics of the corporation were taken into consideration in projecting a rate of return a reasonable investor would expect in a purchase of the corporation.
There is merit to the defendants' claims that some reduction should be accorded the value of the plaintiffs' shares due to their minority status. This result is premised on the notion that the purchase of a non-controlling portion of the company's stock makes ownership of the stock less valuable than its mathematical percentage of the whole simply because the owner of minority shares has little influence in the business course of the corporation. Whether or not to apply a discount to the value of minority shares appears to be within the discretion of the court, but to do so appears to be in accord with sound business judgment. Accordingly, the court finds that a total reduction of 20% in value due to the plaintiffs' status as minority shareholders would be appropriate. On this basis, the net aggregate fair value of the plaintiffs' stock is $1,720,000.
In determining the value of their shares, the plaintiffs argue that they should be compensated for the oppressive conduct of the defendants. There is no appellate authority in Connecticut regarding shareholder oppression. There is one superior court case which addresses this issue.Stone v. R.E.A.L. Health, P.C., CV98 0414972 (Munro, J.). In that case, the court looked to the Model Business Corporation Act for guidance. "If the court finds that the value of a corporation has been diminished by the wrongful conduct of controlling shareholders, it would be appropriate to include as an element of fair value the petitioner's proportional claim for any corporate injury." Oppressive conduct has been defined as that which defeats the reasonable expectations of a minority shareholder. Rambausch v. Rambausch Decorating Co., 143 App.Div. 605 (1st
Dep't 1988); In re Kemp Beatley, Inc., 64 N.Y.S.2d 63 (1984). Oppressive conduct is that which may be described as "harsh and wrongful conduct, a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members, or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder is entitled to rely." Churchman v. Kehr, 836 S.W.2d 473, 482
(Mo.Ct.App. 1992).
The plaintiffs claim that the failure of the corporation to declare CT Page 11199 dividends was oppressive. Historically, the corporation has never declared dividends to any of its shareholders. This is not a policy that went into effect when the plaintiffs became shareholders, but has been the company policy since its inception. The plaintiffs claim additionally that because they were not allowed to be on the board of directors, they were oppressed. The plaintiffs have offered no evidence to support their expectation to serve on the board other than their status as shareholders and family members and the assertion that Randy Johnson is no more qualified to be on the board than they are. Randy's relative lack of education is not a reason to add the plaintiffs to the board of directors. The plaintiffs also claim that since they were not allowed to continue their employment at the company, they were oppressed. Although the plaintiffs have not been employed by the corporation in some time, they have continued to receive compensation and benefits. Given the animosity between the parties to this action, the refusal to offer current employment to the plaintiffs is not an unwise decision by the corporation. And, although the inability to obtain the corporate minutes was no doubt an annoyance, it does not rise to the level of Oppression.
The plaintiffs argue that they should be compensated for the defendants' mismanagement of corporate assets or corporate waste. Their principal claims of corporate waste involve excessive compensation and benefits afforded Randy Johnson. For the three years 1996 through 1998 Randy Johnson was paid W-2 compensation averaging 289,880, or approximately 115,000 a year greater than the total compensation reasonable for the chief executive officer of this company. While this amount was greater than necessary, the court does not find that it is tantamount to corporate waste. Corporate waste occurs when a corporation effects a transaction on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange. Steiner v. Meyerson, 1995 Del. Ch. LEXIS 95 (1995). Although the court has found the executive compensation paid to Randy Johnson excessive, it does not necessarily transcend sound business judgment. In fact, there has been evidence presented to this court of a wide range of executive compensation which might be considered reasonable by others in the industry. In determining the equity value of the corporation, the court has already normalized executive compensation to a more appropriate level. Therefore, the court has determined not to make any further adjustment in favor of the plaintiffs due to the excessive compensation paid to Randy Johnson.
Accordingly, the court finds the aggregate fair value of the plaintiffs' stock to be $1,720,000. The parties have requested that the court defer any orders regarding payment in order to give them an opportunity to discuss the terms of payment. Accordingly, this memorandum should be treated as an interim decision. The matter is continued to September 10, 2001 at 2:00pm for a hearing regarding payment of the CT Page 11200 amount the court has determined is due the plaintiffs for their ownership of the corporation.
Bishop, J.